IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| JOHN ALMS, Individually and on Behalf of All Others Similarly Situated, | Case No.:  6:23-cv-982-JSS-LHP |
| Plaintiff, v. | SECOND AMENDED CLASS ACTION COMPLAINT |
| LUMINAR TECHNOLOGIES, INC., MIKE MCAULIFFE, AUSTIN RUSSELL, and JASON EICHENHOLZ, | DEMAND FOR A JURY TRIAL |
| Defendants. | |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................ 1

II.   SUMMARY OF THE ACTION .................................................. 4

III.  JURISDICTION AND VENUE ................................................ 12

IV.   THE PARTIES ......................................................................... 13

    A.    Lead Plaintiff ................................................................ 13

    B.    Defendants .................................................................... 14

V.    BACKGROUND OF THE CLAIMS ........................................ 16

    A.    Lidar Technology .......................................................... 16

    B.    The Background of Luminar and Luminar Semiconductor ........ 20

    C.    Luminar's Iris+ Lidar Sensor ...................................... 25

    D.    Lidwave ......................................................................... 27

    E.    Background of Luminar Investor Day .......................... 29

VI.   CLASS PERIOD FALSE AND MISLEADING STATEMENTS ........... 32

VII.  THE TRUTH ABOUT LUMINAR'S "CHIP" IS DISCLOSED ............. 37

VIII. ADDITIONAL SCIENTER ALLEGATIONS ......................... 41

    A.    *Respondeat Superior* and Agency Principles Apply ..................... 41

    B.    Defendants Knew Or Were Reckless In Not Knowing That The PIC Pictured In The PowerPoint Presentation Was Manufactured By Lidwave ....... 41

    C.    Luminar Did Not Correct Its Deception Until Forced To Do So By Its Competitor .................. 45

    D.    The PIC Was Luminar's Core Operation .................... 46

IX.   LOSS CAUSATION ................................................................ 49

X.    CONTROL PERSON LIABILITY .......................................... 51

XI.   APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE .... 52

XII.  AFFILIATED UTE PROVISION ............................................ 54

XIII. NO SAFE HARBOR ............................................................... 54

i

XIV.  CLAIMS FOR RELIEF ................................................................ 56

XV.   CLASS ACTION ALLEGATIONS ......................................... 61

XVI.  PRAYER FOR RELIEF ......................................................... 65

XVII. JURY TRIAL DEMAND ........................................................ 66

Lead Plaintiff John Alms ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's second amended complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Luminar Technologies, Inc. ("Luminar" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Luminar securities between February 28, 2023, and March 17, 2023, both dates inclusive (the "Class Period").  Plaintiff is seeking to recover damages caused by Defendants' violations of the federal securities

laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its senior executives.

2.     The SEC performed a review of certain Luminar SEC filings in 2022.  The results of that review revealed that Luminar had been playing the game of "fake it until you make it," as claimed by Sumit Sharma ("Sharma"), the Chief Executive Officer ("CEO") of Multivision Inc. ("Multivision"), a competitor of Luminar.

3.     In Luminar's December 2022 response to the SEC's inquiry regarding a Form 8-K filing and its annual report for 2021 the Company admitted to the following: "[a]t the end of 2021, ***the Company neither achieved technological feasibility of its developed software nor achieved a level of certainty to anticipate imminent sales of commercial grade*** series production lidar sensors and had not commenced sales of commercial grade series production of its lidar sensors."  Luminar's response to the SEC inquiry is attached at Ex. A (quotation at 5).

4.     In that same response to the SEC, Luminar also admitted: ***"None of our customers make contractual commitments to use our lidar sensors*** and software until all test and validation activities have been completed, they have finalized plans for integrating our systems, have a positive expectation of the market demand for our features, and unrelated to

2

us, have determined that their vehicle is ready for market and there is appropriate consumer demand. ***Consequently, there is no assurance or guarantee that any of our customers, including any programs which we included in our Order Book estimates will ever complete such testing and validation or enter into a definitive volume production agreement with us or that we will receive any billings or revenues forecasted in connection with such programs.*** *Id.* at 3.

5.      Luminar has lost money every year since it went public.  In the face of this, Luminar's founder and CEO, the Defendant Austin Russell ("Russell") touted the Company's successes and projected great success.

6.      For example, in its February 28, 2022 quarterly report (one of the filings the SEC later reviewed), Russell claimed that the Company had a "blowout success" in its first year as a public company and had "achieved all of our critical milestones", "secured major commercial wins" and that "2022 will be our biggest year yet as we prepare for our breakthrough series production launch at year-end."

7.      On February 28, 2023, while still losing money, Luminar hosted its first ever investor day ("Luminar Investor Day").  At that event, Defendant Russell continued with the hype, not bothering to explain to his wide audience that orders in the "order book" were completely non-binding. He boasted: "Luminar is very uniquely positioned to be able to ***deliver real***

3

*revenue, scalable profits and exponential growth from our multi-*

*billion dollar order book* over both the near term and the long term . . . ."

8.    Luminar's stock price on Luminar Investor Day closed at $8.95.
Since then the stock price slid, and Luminar traded at less than $1.65 for the
entire month of June 2024.

9.    Sharma, the CEO of Multivision and knowledgeable industry
insider suggested after Luminar Investor Day that all at Luminar may not be
what its seems.[1]

10.   It is undisputed that a stolen image of a competitor's PIC chip that
was used by Luminar to tout it's claimed advances in technology for Luminar
Investor Day was ***not what it seemed***.

## II.    SUMMARY OF THE ACTION

11.   This case centers on the Defendants' misrepresentations to the
market about its photonic integrated circuits ("PIC"), a critical component in
its newly launched Iris + light detection and ranging sensor (referred to in

---

[1]    When asked directly about a new product launch touted at Luminar Investor Day Sharma suggested that Luminar may not have much than Computer Aided Design graphics: "The product, I think a lot of people have asked me a question already like about the product that they have announced today.  And, again, brief review that I did of it. And ***all I saw was CAD***, we've [Microvision] been showing products with the cover off for a while, and supply chain reviews. And we've launched wafers, and we're much further along. So I'm not really sure that -- more data is needed. And I think it's for them to describe to the market and to their investors and analysts. And I think it'd be inappropriate for me to comment beyond just as an engineer saying, cool. That's really cool CAD."

the industry as "lidar" or "LiDAR"), and a critical component in Luminar's big plans to grow in a very competitive market.

12.     Lidar sensors are remote, laser scanning systems that are used to provide directional images for vehicles offering autonomous features by providing a high-resolution 3D view of the vehicle's surroundings. Lidar sensors have been described as the light-based cousin of RADAR, which uses radio waves. Lidar involves sending out a pulse of light, receiving it back, and using a computer to create a 3D model of its surroundings. They have traditionally been expensive and bulky machines sitting on top of vehicle roofs. However, in recent years, technology companies have invested heavily to scale lidar sensor production and to make significant design adjustments so that the lidar sensors can be mounted into smaller, more aesthetically pleasing shells for widespread use in automobiles. It would be well understood by investors that advances in shrinking the size of PIC chips in order to lower production costs and increase design options for car makers would be critical to the success of the company.

13.     PICs are small chips that generate the laser beams and conduct the scanning function in lidar sensors. Improvements in integrated PIC chip designs have contributed greatly to the development of smaller and lower cost PIC chips that would be scalable for the automotive industry. It would be well understood by investors that advances in the state of design of

Luminar's PICs to make them more powerful and to integrate more functions (not unlike what Intel Corp. has done with its processors for home computers) would be critical to the success of the Company.

14.    At the much-anticipated Luminar Investor Day on February 28, 2023, Defendants touted Luminar's technology.  During the presentation, the Individual Defendant Michael McAuliffe ("McAuliffe"), the CEO of Luminar Semiconductor (the subsidiary making Luminar's PIC chips), boasted that through the use of its proprietary semiconductor technology, Luminar has been able to develop a higher power laser with longer detection range and increased accuracy, while also minimizing costs

15.    While making these and other statements, McAuliffe presented a slide entitled "Common Platforms Drive Scale" to complement his discussion of the Company's focus on driving the economies of scale by engineering smaller, more powerful PIC chips that could be mass produced economically. Such chips would incorporate more and more functions at a lower cost because they are silicon chips, as opposed more bulky wired circuits and hardware.   McAuliffe referred to this process as "siliconization".  This slide included an impressive color image of a highly "siliconized" PIC chip that Luminar claimed to have designed.  *See* Figure 1, below.



Figure 1.  The image displayed by Luminar to represent its PIC at the Luminar Investor Day.

16.    This specialized PIC chip used in the display integrates both an Optical Chip component and an "ASIC" (application-specific integrated circuit) processor optimized for Lidar.  It would be absolutely impossible to mistake this for a "generic" image of a silicon chip.  Indeed, a Google search for the words "generic computer chip" results in hundreds of images, but none of a picture of this chip.

17.    In fact, this image purporting to be Luminar's chip and highlighted to compliment McAuliffe's presentation, was not made by Luminar.  It was one of its competitor's advanced PIC chips.  The competitor and designer of the PIC displayed is a privately owned Israeli company called Lidwave. ***Luminar has no such chip or design and the chips it does have are not as advanced in terms of siliconization and do not offer the same promise of low-cost scalability.***

18.    The fact that Luminar's technology for this kind of chip was not

as advanced in this area as that of Lidwave would have been apparent to
investors had Defendants instead displayed the image of Luminar's bulky
technology.  ***The actual Luminar chip image would have belied the
narrative given by Russell and McAuliffe.  The true image of the
Luminar chip would have informed investors that Luminar was not
even close to a design that could achieve Luminar's stated goals of
true "siliconization" and scalability.***

19.    The Luminar chip image that was used to replace the stolen
image would have been incapable of being repeatedly printed on silicon
sheets for use in commercial mass production.  It is no surprise that when
investors learned the truth about the current state of development of
Luminar's chip, the stock price plummeted precipitously.

20.    After the truth came out, Lidwave issued a statement about its
chip design: "This technology allows us to integrate all optical parts at the
chip level, ***as demonstrated in the Lidwave product image*** that Luminar
copied without our permission."

21.     The Lidwave chip was far more advanced that the Luminar chip
when it came to "siliconization," the key feature that Russell was touting to
investors regarding Luminar's chip development.

22.    The actual PIC developed by Luminar was crude looking and had
rough edges, which you would not even see in low-cost home electronics.  *See*

8

Figure 2, below. It was obvious that this was not an advanced design, unlike Lidwave's product.



Figure 2. The image of Luminar's PIC that was substituted for the misappropriated image of Lidwave's PIC after the deception by Luminar was exposed.

23.     In contrast, the Lidwave chip (Figure 1) incorporated into the silicon design, ASIC circuits that extract accurate depth information using a narrow electronic bandwidth.

24.     Luminar does not have an agreement with Lidwave to use its technology – including its chips – in the Iris + sensors, and did not have permission to use an image of Lidwave's PIC chip to represent a Luminar PIC chip to investors.

9

25.    Lidwave confirmed that its chip was more advanced that Luminar's and issued a statement to that effect: "***Luminar does not have the ability to produce a product like this***, and [Lidwave] is the only company in the world that has succeeded in inventing a physical method that enables the integration at the chip level."

26.    Luminar felt it had to lie.  Luminar is in the highly competitive emerging industry of providing automation systems that aid or control the driving functions of cars and trucks.  Numerous competitors were all vying for investor capital. Luminar's future success depended in part on convincing investors that its technology would prevail.

27.    In order to prevail against its competitors, Luminar needed to pull ahead in the race to miniaturize and lower the cost of its equipment and not fall behind its competitors.  ***In order to keep raising capital, it had to at least give the impression that that was what was happening.***

28.    A pivotal theme of the Luminar Investor Day presentation was that Luminar was aggressively making progress in shrinking the size of its components and lowering the cost.

29.    As shown in the graphic below (Figure 3), Luminar was promising investors a forthcoming next generation of equipment that would be smaller and more advanced than previous products.



Figure 3.

30.    Luminar has been losing money since it went public.  *See* Figure 4, below.

| ($M) | GAAP Twelve months ended Dec 31 | | NON–GAAP[2] Twelve months ended Dec 31 | | | | Twelve months ended Dec 31 | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | | ($M) | 2022 | 2021 |
| Revenue | $40.7 | $31.9 | $40.7 | $31.9 | | Free cash flow [1] | $(226.3) | $(154.9) |
| Cost of sales | $101.0 | $46.1 | $92.7 | $39.7 | | | | |
| Gross loss | $(60.3) | $(14.2) | $(52.0) | $(7.7) | | | | |
| Operating expenses | $382.1 | $200.4 | $220.7 | $126.9 | | | | |

Figure 4.  Luminar FY'22 Selected Financials from its Luminar Investor Day conference held on February 28, 2023 at 162.

31.    Luminar's lie about the true appearance of its core lidar component was revealed to the market on March 17, 2023, when Forbes published an article entitled "Lidar Maker Luminar Accused of Using Image of Rival's Chip In Investor Conference" (the "*Forbes* Article").  The *Forbes* Article reported that Lidwave had sent a cease-and-desist letter to Luminar

accusing Luminar of passing off Lidwave's PIC as its own in its Luminar investor day presentation and reported that Lidwave was considering pursuing legal action. The *Forbes* article also reported that Lidwave had "also notified the Securities and Exchange Commission of Luminar's 'misuse of its product image to falsely promote its abilities and securities to investors.'" After the Forbes article was published, Luminar immediately replaced the image of the Lidwave chip with an image of its own PIC chips. Notably, the PIC chip in the updated photo appears to be a larger, bulkier, and much less sophisticated chip design than Lidwave's chip design shown on Luminar Investor Day.

32.     When the truth about the false depiction of Luminar's PIC chip was disclosed in the *Forbes* Article, Luminar's stock price reacted immediately and dropped a dramatic 9.09%, over two consecutive trading days, to close at $7.80 per share on March 20, 2023.

33.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock when the true facts came to light, Plaintiff and other Class Members have suffered significant losses and damages.

## III.    JURISDICTION AND VENUE

34.     This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)), and SEC Rule 10b-5

promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

35.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Luminar's principal executive office is located in Orlando, Florida, which is situated in this District, and the alleged activity and subsequent damages took place in this Judicial District.  Pursuant to Luminar's Prospectus Summary filed with the SEC on September 8, 2023, as of July 31, 2023, Luminar had 293,291,160 and 97,088,670 shares of Class A and Class B common stock outstanding, respectively.  Accordingly, there are presumably hundreds, if not thousands, of investors in Luminar's common stock located in the U.S., some of whom undoubtedly reside in this District.

37.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.   THE PARTIES

### A.   Lead Plaintiff

38.     As shown in his PSLRA Certification, Lead Plaintiff John Alms

13

purchased Luminar common stock at artificially inflated prices during the
Class Period and was injured thereby.

**B.    Defendants**

39.    Defendant Luminar is a Delaware corporation with principal
executive offices located at 2603 Discovery Drive, Suite 100, Orlando, Florida
32826.  The Company's common stock trades on the NASDAQ Global Select
Market under the ticker symbol "LAZR."

40.    Defendant McAuliffe has served as the CEO of Luminar's
subsidiary, Luminar Semiconductor, from October 2022 to the present.  As
the CEO, McAuliffe ran the day-to-day operations of Luminar Semiconductor.

41.    Defendant Russell is the founder of Luminar and at all relevant
times served as the Company's president, CEO, and chairman of the board of
directors.

42.    Defendant Dr. Jason Eichenholz ("Eichenholz") is the Chief
Technology Officer ("CTO") of Luminar and Chairman of the subsidiary
Luminar Semiconductor.

43.    Together McAuliffe, Russell, and Eichenholz are referred to
herein as the "Individual Defendants."

44.    The Individual Defendants, because of their positions with the
Company, possessed the authority to control, correct, and/or update the
contents of Luminar's public disclosures to the market.  The Individual

14

Defendants had the duty to exercise due care and diligence and the duty of
full and candid disclosure of all material facts relating to the Company's
financial results and operations.  The Individual Defendants further had the
duty to correct and/or update any previously issued statements that were
untrue or became materially misleading or untrue, so that the market price
of the Company's publicly traded common stock would be based upon
truthful, complete, and accurate information.  To discharge their duties, the
Individual Defendants were required to exercise reasonable and prudent
supervision over the dissemination of information concerning the Company's
financial results and operations.  By virtue of such duties, the Individual
Defendants were required, *inter alia*, to:

a)     conduct and supervise the business of Luminar in accordance
with federal laws;

b)     supervise the preparation of Luminar's SEC filings and approve
any reports concerning Luminar's financial reporting and results;
and

c)     ensure that Luminar established and followed adequate internal
controls.

45.     As officers and controlling persons of a publicly-held company
which is registered with the SEC under the federal securities laws and the
securities of which were traded on the NASDAQ and governed by the

15

provisions of the federal securities laws, the Individual Defendants had a duty to (1) promptly disseminate complete, accurate and truthful information with respect to the Company's financial statements and operations; (2) correct any previously issued statements that were materially misleading or untrue so that the market could accurately price the Company's publicly traded securities based upon truthful, accurate, and complete information; and (3) update any previously-issued statements that became materially misleading or untrue so that the market could accurately price the Company's publicly traded securities based upon truthful, accurate, and complete information.

46.    Luminar and McAuliffe are primarily liable for the misrepresentations and misleading statements alleged herein and the Individual Defendants are liable as controlling persons of Luminar.  The scheme deceived the investing public regarding Luminar's financial condition, which caused Plaintiff and other members of the Class to purchase Luminar common stock at artificially inflated prices during the Class Period and suffer damages as a result.

## V.    BACKGROUND OF THE CLAIMS

### A.    Lidar Technology

47.    Luminar is in a highly competitive industry.  It is in competition with over twenty other companies globally, all trying to quickly advance lidar

technology which can be used in the growth industry of autonomous and semi-autonomous vehicles.

48.    Lidar (light detection and ranging; a photon-based version of radar) is a remote sensing technology that leverages laser light to measure distances and construct maps of the environment.  Lidar operates by emitting laser pulses and determining the time elapsed for the pulses to reflect off objects and return to the sensor.  This data is used to create 3D models of its surroundings.  Lidar technology finds application in multiple sectors, such as autonomous vehicles, geography, archaeology, and meteorology.

49.    In cars in particular, lidar technology helps the vehicle sense and understand its surroundings.  The technology uses laser pulses to create 3D mappings of its environment, including objects like buildings, roads, and other vehicles.  This information is then combined with other data to ensure safe navigation.  The technology is primarily used in advanced driver-assistance systems and operation of autonomous vehicles.

50.    A typical lidar system will require a mechanical system that physically moves the light source around to scan the environment.  This could be as simple as a 360-rotating lidar scanner or may involve the use of small scanning mirrors to steer the beam.  Lidar systems have traditionally been large and bulky.  Below is a picture of an early version of a self-driving car with a lidar sensor attached to the roof of the vehicle:

17



51.    In recent years, lidar manufacturers have started using more advanced photonic integrated chips ("PIC chips") to scale down the size of the traditional lidar sensor.  PICs are chips that contain photonic components that work with light (photons).  PICs are used to replace the beam-steering part of the lidar, through the use of optical phased arrays.  Optical phased arrays steer or operate laser beams.  Such optical phased arrays can shape the laser beam and steer it fast for video-rate three-dimensional imaging.

52.    Below is a schematic of an optical phased array, using optical phase control (left) and wavelength control (right) for beam steering:



53.     PICs offer advantages such as miniaturization, higher speed, low thermal effects, large integration capacity, and compatibility with existing processing flows that allow for high yield, volume manufacturing, and lower prices.  Therefore, given the advantages of using PICs in lidar sensors, technology companies have been in a race to create the sleekest, most economical PICs for lidar that can be scaled for mass production at low cost. Panelists at the Optical Fiber Communication Conference 2023 in San Diego "all agreed on the fundamental notion that for [LiDAR] technology to reach the scale that automotive applications require, then ***the miniaturization driven by chip-scale photonic integration is a mission-critical goal."***

54.     Indeed, currently the biggest obstacle holding back large-scale production of lidar for use in vehicles is the cost of assembling such complex components with extreme precision.  Scaling the production of the devices remains a challenge for manufacturers, and therefore, integrating as many

functions into smaller, more advanced PIC chips was important in the

advancement of the technology and lowering costs of production.

**B.    The Background of Luminar and Luminar Semiconductor**

55.    Luminar was founded in 2012 to develop advanced sensor

technologies and software for the automotive industry.  More specifically, the

Company manufactures commercial lidar and the accompanying software.

Luminar describes itself as "a global automotive technology company . . . .

building from the **chip-level up**, our light detection and ranging sensor, or

lidar, which is expected to meet the demanding performance, safety,

reliability and cost requirements to enable next generation safety and

autonomous capabilities for passenger and commercial vehicles as well as

other adjacent markets."  The Company has the following two operating

segments:

a)    "Autonomy Solutions" for automotive applications, which

includes manufacturing and distribution of lidar, non-recurring

engineering services related to the Company's lidar products, and

development of software products that enable autonomy

capabilities.

b)    "Advanced Technologies and Services ("ATS")" which includes

development of application-specific integrated circuits, pixel-

based sensors, advanced lasers, as well as designing, testing and

20

providing consulting services for non-standard integrated circuits.

56.    To obtain the capabilities and intellectual property to develop its lidar products from the chip-level up, beginning in 2018, Luminar began acquiring semiconductor companies.  Indeed, in April 2018, Luminar acquired Black Forest Engineering ("Black Forest"), which gave Luminar access to Black Forest's Indium Galluim Arsenide receiver chips which are used to detect the 1550 nm light around which the lidar systems are based.[2] On August 3, 2021, Luminar acquired Optogration, Inc. ("Optogration"), which allowed Luminar to secure the intellectual property and supply of Indium Galluim Arsenide photodector chips which are used to convert optical power into an electrical current.  On April 13, 2022, Luminar completed its acquisition of Freedom Photonics LLC ("Freedom Photonics"), which allowed Luminar to secure intellectual property and the supply of a key enabling component for photonic products.  Speaking about the acquisition, CTO Eichenholz stated that "[b]ringing Freedom Photonics into Luminar enables a new level of economies of scale, deepens our competitive moat and strengthens our future technology roadmap . . . . We've worked closely with the Freedom team for the past several years."

---

[2]    1550 nanometers is a measurement of the wavelength of the laser used in the lidar.

57.    In February 2023, Luminar consolidated its three chip design

subsidiaries – Black Forest Engineering, Optogration, and Freedom

Photonics – into a new entity named Luminar Semiconductor.  Luminar

Semiconductor is focused on the mission of fueling advancements for

Luminar's next-generation sensors, including developing PIC chips, while

simultaneously leveraging these advanced semiconductor technologies for

other applications and industries.

58.    McAuliffe was appointed as the CEO of Luminar's subsidiary,

Luminar Semiconductor.  During his presentation at Luminar Investor Day,

McAuliffe stated that the mission of Luminar Semiconductor was "to take

those [three companies] into an integrated company and to take them to the

next level, the next level of capabilities, the next level of products, to drive

the current and future Luminar roadmaps, but importantly, also to create a

broader ambition to be a photonics player in the wider market" and that, at

its core, Luminar Semiconductor "build[s] chip scale components and chip

scale optoelectronic engines to solve really impactful problems for the world

working with industry leaders," number one being "Luminar, our number one

customer[,] solving probably the most impactful problem of them all[:]" a

smaller, scalable lidar sensor for passenger and commercial vehicles.

59.    As the first slide of McAuliffe's presentation made clear, the

purpose of Luminar Semiconductor was to "[e]nable[] Luminar to fulfill its

mission" of developing an economically advantageous lidar for passenger and commercial vehicles. *See below* Figure 5, Luminar Investor Day Slide Deck at 84.



60.     The development of an advanced PIC is critical to the success of the company and is integral to the products the company intends to bring to market.

61.     Luminar Semiconductor is not just limited to servicing consumer and commercial vehicles, but additionally to developing technology that "can be applied to other markets, other customers [who] have similar problems, who are generating photons, detecting photons, processing photons, they recognize how difficult it is, what value we can create, so they're also interested, and we can create broader opportunities across wider markets."

62.     As one analyst report put it, Freedom Photonics, Black Forest Engineering, and Optogration were merged to "enhance [Luminar's] supply chain capabilities" and provide semiconductor products to a wider market.

Indeed, Luminar Semiconductor was created "in an effort to industrialize
Luminar's photonics and optoelectronics based technologies to cater to
opportunities in Datacom/Telecom, Aerospace, Precision Manufacturing and
Life Sciences together making a TAM [total addressable market] of over $50
bn."

63.    News outlets made special note of the creation of this new
Luminar subsidiary.  On February 28th, one news outlet noted that, "[t]he
Company also announced a series of ambitious expansion plans, including . . .
a semiconductor subsidiary. . . . The Company announced the combination of
its chip design subsidiaries Black Forest Engineering, Optogration, and
Freedom Photonics into a new unified entity, Luminar Semiconductor." The
following month, another news outlet noted that "the advanced receiver, laser
and processing chip technologies provided by this entity [Luminar
Semiconductor] are not limited to lidar-based applications."

64.    The importance of this segment of Luminar's business, dedicated
to the development of semiconductor technology, cannot be overstated.  As of
June 30, 2023, ATS, which is the "segment [that] is in the business of
development of semiconductor technology based lasers and sensors" that "also
designs, tests, and provides consulting services for development of integrated
circuits[,]" was $73,664,000, a significant portion – over 9% – of Luminar's
assets.

24

65.     With such big expenditures to acquire smaller companies, the
expectations for great progress in chip integration were very high, and the
graphic of Luminar's actual chip made clear that those expectations had not
been met.

66.     Rather that admit the truth, it appears certain that Luminar
intentionally targeted and borrowed an image from its competitor, Lidwave,
that had been focused for many years on the type of chip integration Luminar
was touting but did not possess.

### C.     Luminar's Iris+ Lidar Sensor

67.     Luminar had produced one lidar sensor called Iris.  The Iris lidar
combines a laser transmitter and receiver and provides long-range, 1550
nanometer sensory capacity for autonomous navigation.  The Iris sensor has
a dual-axis scanner that can detect objects up to 600 meters away over a
horizontal field of view of 120° and a software-configurable vertical field of
view of up to 30°, providing high point densities in excess of 200 points per
square degree,[3] which enables long-range detection, tracking, and
classification over the whole field of view.

68.     The Iris lidar uses Luminar's vertically integrated receiver,
detector, and laser components, including PIC chips, developed by the

---

[3]     The point density of lidar data defines the amount of measurements per area that is
sampled by the sensor.

Company's subsidiary, Luminar Semiconductor.  The Iris is designed to meet the size, weight, cost, power, and reliability requirements of automotive qualified series production sensors and satisfy original equipment manufacturer specifications,[4] meaning that the product is qualified to be installed in vehicles globally.  The sensor would be integrated into the roofline of a vehicle.  A photo of a deconstructed Iris lidar, showing the components that make up the product, is featured below:



69.    Below is a picture of what the Iris sensor looks like integrated into a vehicle's roofline:

---

[4]    An original equipment manufacturer is a company that manufactures products or parts designed to be incorporated into an end-product from a different company.



70.     As of its Luminar Investor Day on February 28, 2023, Luminar had not yet become profitable.  For the quarter ended March 31, 2023, which covers the entirety of the Class Period, Luminar reported a gross loss of approximately $14.6 million.

**D.    Lidwave**

71.     Lidwave is a start-up company based in Jerusalem, Israel, that develops high-performance, scalable, LiDAR-on-a-chip sensors.

72.     LiDAR-on-a-chip solves problems posted by traditional lidar devices, which are expensive, bulky, contain moving parts, and are difficult for commercialization.  LiDAR-on-a-chip integrates all the optical components necessary for lidar (*i.e.*, it uses integrated photonics) onto a single photonic chip, allowing for faster production at a lower cost per chip.

73.     According to Lidwave, its Finite Coherent Ranging
architecture—its core technology—allows it to integrate all optical parts at
the chip level, which is what is demonstrated in the picture below (Figure 1)
of the Lidwave PIC:



74.     Yehuda Vital, the CEO of Lidwave, said that Luminar and its
other competitors were watching his company's pioneering work in PIC chip
integration.  "[I]t's the holy grail in the field of lidar. Everyone dreams of
reaching it . . ."

75.     According to Lidwave, ***Luminar does not have the ability to
produce a product like their PIC chip in the stolen image, and the
image itself make clear that the PIC chip pictured incorporates
advanced technology***.  Lidwave stated that: "After intensive R&D we have
invented the Finite Coherent Ranging - FCR™ architecture (Lidwave's core

IP). This technology allows us to integrate all optical parts at the chip level,

***as demonstrated in the Lidwave product image*** that Luminar copied

without our permission."

76.    In contrast, Luminar has removed its entire Luminar Investor

Day presentation, including all images, from the internet.  To that extent,

Luminar has attempted to bury the clunky image of a Luminar PIC and the

narration of the slide show delivered by Russell and McAuliffe touting

"siliconization" and scalability.

### E.    Background of Luminar Investor Day

77.    On December 22, 2022, Luminar announced that it would be

hosting its first-ever Luminar Investor Day conference on February 28, 2023,

at its headquarters.  "At the event," which was to be held for consumers,

investors, customers and suppliers, Luminar planned to "unveil its long-term

product and technology roadmap for existing and new [original equipment

manufacturer] customers."

78.    Analysts anticipated that the Company would discuss its

financial updates and progress on economizing its lidar technology.  Deutsche

Bank expected that Luminar would "initiate 2023 guidance, update investors

on its progress towards scaling production and reducing BoM leading to

refreshed mid-decade revenue and margin targets, and perhaps share an

updated vision for the company by 2030." J.P. Morgan, meanwhile, expected

that "[t]he longer-term implications of the series production milestone in
terms of greater confidence from customers in adopting the product across
more vehicle models, will likely be more evident at Luminar's investor day
update early next year."

79.    At Luminar Investor Day, Company executives and third-party
industry leaders discussed Luminar's vision and execution as well as the
industry's move toward next-generation technology.

80.    Critically, at the February 28, 2023 Luminar Investor Day,
Luminar unveiled the long-anticipated Iris+ lidar sensor which offers a
slimmer profile for more seamless integration into vehicle rooflines compared
to its predecessor, Iris, and is expected to hit series production vehicle
integration in 2025 as reflected in below slide.



81. Luminar also claimed that its Iris lidar technology was planned to be implemented in over 20 production vehicles across multiple automakers, and is expected to garner at least triple-digit revenue growth each year for the next five years.

82. The unknowing market's reaction to Luminar Investor Day was very positive. Analysts were encouraged by Luminar's business pipeline and path to high-volume production. A Citi analyst noted that "the Investor Day provided a number of encouraging updates across the technology/product roadmap (particularly around insurance, next-gen LiDAR and Luminar semiconductor), the new business pipeline, path to high volume production and LT financial targets." Also, a Deutsche Bank analyst stated that Luminar investor day "mainly showcased [the Company's] strong commercial and cost traction, and shared updated mid-to long-term targets which still track closely with its original forecasts at the time of de-SPAC." Additionally, a Craig-Hallum analyst stated that "LAZR's Investor Day . . . . clarif[ied] its medium and long-term outlook/financial structure, and showed the strength of its existing wins with Volvo/Mercedes/SAIC/Polestar."

## VI.   CLASS PERIOD FALSE AND MISLEADING STATEMENTS

83.     The Class Period begins on February 28, 2023, at the above-described first-ever Luminar Investor Day.  The conference was held at Luminar's headquarters and was made available *through* a live webcast on Luminar's website and as a recorded webcast on *YouTube,* which had nearly 750,000 views.

84.     During the conference, McAuliffe presented a series of slides discussing Luminar Semiconductor's role in advancing Luminar's position in the photonics and LiDAR markets.  The slides were also available in investor presentation materials on Luminar's website.

85.     The entire deck of slides was false and misleading as to Luminar's technological advancement because a critical component, the image of Luminar's core chip technology, was fraudulent and displayed an image of a rivals advanced PIC chip, not Luminar' PIC which did not have the technological capability of the PIC chip developed by rival company, Lidwave.

86.     While discussing the common needs of Luminar Semiconductor's business, McAuliffe touted Luminar Semiconductor's unique ability to minimize cost and complexity through its technology.  More specifically, McAuliffe stated, in part:

It's fundamental to our strategy to understand that th[ese] common
needs can drive common platforms, we only focus on the hardest
Photon processing problems generation detection and processing . . . .

We solved 1550.  There is a general perception that 1550 is an
expensive, traditionally, an expensive process and it's maybe a
drawback.[5]  That is not the case.  We have solved that problem
through, number one: architecture, as Jason described.  Number two:
advanced packaging.  And number three: we can drive the economies of
***scale*** and the economics associated with that by leveraging both
Luminar volume and volume to the wider market.
So, we're shifting gears. ***We're shifting gears to take what has been
a sub-scale industry, sub-scale ecosystem, and industrializing
that at scale.  And we need to do that, we need to do that both
for the economics and for size, weight, and cost, in order to
deliver lidars at millions of units.***

And as an example, the other key advantage of ***siliconization*** is this:
people think that maybe the biggest advantage is you control your own
supply chain, that's true.  You can control the quality, that's true.  You
can control the performance, that's true.  But the biggest advantage of
***siliconization*** in general, is you can take a lot of complexity and cost
out of the product.  Complexity in cabling.  Complexity in optics.
Complexity in electromechanical.  So anything you can put in ***silicon***,
you can put in ***silicon***.

And I think we can see from other industry leaders like big fruit
companies, that owning that stack, and internalizing, and
***siliconizing*** anything that you can, delivers elegant architecture,
breakthrough performance, and breakthrough economics.

87.    The slide presented while McAuliffe was speaking was entitled

"Common Platforms that Drive Scale" and appeared as follows:

---

[5]    "1550" refers to the development of laser technology that uses the longer wavelength
of 1550 nanometers, as opposed to the traditional wavelength of 905 nanometers.  The use
of the higher-power laser with 1550 nm allows for measurements with higher fidelity, at
longer distances, and with more accurate results than any other wavelength option.



88.    Additionally, the following statements were made during the

Luminar Investor Day:

a)    Luminar's strategy to bring these advanced receiver, laser and

processing chip technologies in-house has enabled its unmatched

lidar performance while further securing and industrializing the

lidar supply chain;

b)    At Luminar Day, both our executives and valued partners are all

here to show that we're not only leading in this new era, but also

successfully executing our plans across hardware, software,

industrialization, commercial partnerships, and beyond;

c)    This year is already off to strong start. Existing customers are

expanding their business with us, our dialogue with new customers

is increasing, and the team is doing a great job executing our

industrialization and scaling plans to support upcoming vehicle

launches.

89.    Additionally, on February 28, 2023, the same day as the Luminar

Investor Day, Luminar filed its annual report and quarterly report with the

SEC. In its annual report filed on SEC form 10-K, Defendants Luminar and

Russell made the following statements:

> **_Iris:_** Iris lidar combines laser transmitter and receiver and provides long-range, 1550 nm sensory meeting OEM specs for advanced safety and autonomy. This technology provides efficient automotive-grade, and affordable solutions that are scalable, reliable, and optional for series production. Iris lidar sensors are dynamically configurable dual-axis scan sensors that detect objects up to 600 meters away over a horizontal field of view of 120° and a software configurable vertical field of view of up to 30°, providing high point densities in excess of 200 points per square degree enable long-range detection, tracking, and classification over the whole field of view. Iris is refined to meet the size, weight, cost, power, and reliability requirements of automotive qualified series production sensors. Iris features our vertically integrated receiver, detector, and laser solutions developed by our Advanced Technologies & Services segment companies - Freedom Photonics, Black Forest Engineering, and Optogration. The internal development of these key technologies gives us a significant advantage in the development of our product roadmap.

> **_Core Sensor Software:_** Our lidar sensors are configurable and capture valuable information extracted from the raw point-cloud to promote the development and performance of perception software. Our core sensor software features are being designed to help our commercial partners to operate and integrate our lidar sensors and control, and enrich the sensor data stream before perception processing.

90.    Defendants had posted on the internet the fraudulent slide deck

showcasing a chip that Luminar had not developed, and it was available for

download throughout the Class Period.

91.    The statements in ¶¶ 86-89 above were materially false and misleading when made for two reasons.  First, the statements omitted the fact that in reality, the PIC developed by Luminar was far less sophisticated in design and function than that of its rival which was pictured as a Luminar PIC chip.  As opposed to the Lidwave chip, *the Luminar chip appeared to not be readily scalable and not be entirely siliconized, which was inconsistent with the narrations from McAuliffe and Russell.*  Their narrations were clearly intended for the Lidwave chip, to which Luminar had no rights, but wanted to give the misleading impression that they did. Secondly, Luminar failed to disclose that it relied on a false image of its core technology.  That would have been obviously erroneous to Luminar management who would have been tracking developments in this core operation of the company.  Third, Luminar failed to disclose that if the truth were to be revealed, as it was, that revelation would impugn the company's credibility and subject it to the risk of legal and/or regulatory action.  All of this undisclosed information would foreseeably cause harm to investors and a drop in stock price if and when it was revealed.

92.    In reality, *the PIC developed and manufactured by Luminar Semiconductor was obviously far less sophisticated in design and function with respect to the key areas McAuliffe was touting to the market: siliconization and scalability.*  By picturing Lidwave's PIC

36

without properly attributing the product to Lidwave, and withholding the

image of their own chip, Defendants appeared to want to cover up the

appearance that their PIC chip was less siliconized and less scaleable and

potentially other Luminar products were less scalable than they had been

represented to be.  Things were not as they seemed and Luminar

intentionally misrepresented those things.

93.    The truth would be revealed at the end of the class period on

March 17, 2023.  Following Luminar Investor Day, Luminar's stock price rose

2%, from a close of $8.87 on February 27, 2023 to a close of $9.06 on March 1,

2023.

## VII.  THE TRUTH ABOUT LUMINAR'S "CHIP" IS DISCLOSED

94.    On March 17, 2023, half an hour before the markets closed,

*Forbes* published an article entitled "Lidar Maker Luminar Accused Of Using

Image Of Rival's Chip In Investor Conference."  The *Forbes* Article disclosed

that Lidwave had accused Luminar of passing off Lidwave's next-generation

PIC design as Luminar's own technology after featuring a picture of

Lidwave's PIC in Luminar's slide deck presented during Luminar Investor

Day and linked on the Company's website.  Lidwave also threatened Luminar

with legal action.  More specifically, the *Forbes* Article stated, in part:

> Luminar . . . is accused of passing off a next-generation chip design
> created by a rival as its own technology after showing an image of the
> processor at a recent investor conference and in materials on its

37

website.  Lidwave, the Israeli startup making the claim, says it plans to take legal action over the matter.

The image, identified as a [PIC] by Luminar in its February 28 conference and webcast with no reference to Lidwave, looks identical to a chip on Lidwave's website that is its core technology. The Jerusalem-based company sent a cease-and-desist letter to Luminar on March 14 asking it to remove the image. It also notified the [SEC] of Luminar's "misuse of its product image to falsely promote its abilities and securities to investors."

\* \* \*

"*Integrated photonics allows lidar to become as scalable and profitable as anybody has imagined. . . . But surprisingly, the picture Luminar presented of a [PIC] as their solution is not their solution, but basically the exact image of our lidar*," Lidwave CEO Yehuda Vidal told *Forbes*. "We will continue with a lawsuit if needed because it's a very huge problem for us. Some of our customers are very confused about what we do versus what they do."

95.    The *Forbes* Article featured a picture of the offending slide deck presented by McAuliffe at Luminar Investor Day.  The PIC at issue is the image on the far right of the slide:



96.     The article then compared the picture of the presentation to an

image of Lidwave's PIC featured on Lidwave's website, which appeared

identical to the one featured in Luminar's slide deck:



97.     Later in the day of March 17, 2023, after the close of the market

at around midnight, the *Forbes* Article was updated to add that after being

contacted by Forbes, a Luminar spokesperson stated that: "We have removed

and replaced that image with an image of a new Luminar Semiconductor

photonics integrated circuit[.]"  The revised presentation was pictured in the

article and shows the replaced image of Luminar's PIC on the far-right hand

side of the slide:



98.    The actual image of the PIC designed by Luminar which

Luminar had to substitute for the sleek PIC image of the Ludwave chip is

this image (Figure 2):



99.    The substitution of the images also shows that Luminar did have a picture of its own PIC device readily available, but it chose to use that image, opting instead for a pirated image of the Lidwave PIC.

100.    Following publication of the *Forbes* Article exposing this intentional chicanery to investors, ***Luminar's stock price fell 9.09% over two consecutive trading days to close at $7.80 per share on March 20, 2023.***

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

### A.    *Respondeat Superior* and Agency Principles Apply

101.    Luminar is liable for the acts of McAuliffe, Russell, and Eichenholz, and other Company officers, directors, employees, and agents, under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of McAuliffe, Russell, and Eichenholz and other Company officers, directors, employees, and agents is similarly imputed to Luminar under *respondeat superior* and agency principles.

### B.    Defendants Knew Or Were Reckless In Not Knowing That The PIC Pictured In The PowerPoint Presentation Was Manufactured By Lidwave

102.    Defendants had possession of or access to information indicating

the plain fact that the PIC photograph used during the Luminar Investor Day presentation was misappropriated from Lidwave.  For one thing, two of the images on the slide containing the misappropriated photo (Chip die level and OptoElectronic Engines) appear to have come from a 2019 document created by Luminar Semiconductor's own Freedom Photonics:



103.   This same Freedom Photonics document featured the image of Luminar's PIC that Luminar used to replace the picture of Lidwave's PIC:



104.   Thus, Defendants had access to the correct photo because it was readily available from the same document from which the other two photos were sourced.

105.   As the CEO of Luminar Semiconductor who was responsible for the day-to-day operations of the subsidiary, it was McAuliffe's responsibility to be familiar with Luminar's PIC.  Thus, he would have known that the PIC featured in the slide did not belong to Luminar.

106.   Moreover, during the presentation, McAuliffe spoke extensively about Luminar's semiconductor technology, evincing his familiarity with the chips.  In addition to the false and misleading statements in ¶¶ 86-89 above, when discussing Luminar Semiconductor's devices, McAuliffe explained that:

> We build ***chip-scale*** components and ***chip-scale*** optoelectronic engines to solve really impactful problems for the world. . . .

43

We have our own stack too.  And our stack goes from, what we call, photons to decisions.  And in some ways, it represents the signal processing flow, from the generation of photons with the lasers from Freedom Photonics, the detection of photons at Optogration, and the processing of those photons from Black Forest Engineering.  We then combine that with advanced packaging, up to, then on to the next stage of DSP processing, and AI processing as described by the team earlier on.  And largely, that feeds the signal for lidar, lidar software, perception, and mapping as described earlier on. . . .

our platform is also very unique. . . . I won't go into the acronyms and some of the pretty dangerous materials, but these are pretty special materials.  They're special for generating photons at different wavelengths and for detecting photons at different wavelengths.  So we have a unique set of platforms and capabilities, right down to the atomic level, that we can control, design, and optimize semiconductor platforms for this full stack of technologies. . . .

107.    Finally, Luminar's later claim that the photo of Lidwave's photonic integrated circuit was not intended to "improperly pass off their tech as ours" and was just a "generic graphic of a photonic integrated circuit" makes little sense.  It is nonsense that a company that produces a PIC would put a photo of a generic device as the last image in a series of images (separated by arrows) leading up to the Company's banner product.  The reason for the deception is clear.  Luminar had no product or image to match its words, so it had to steal an image from a company that did.  Indeed, in a competitive scramble for investor capital, it is plausible that Luminar got the idea of raising capital by stealing Lidwave's pitch even though it had little or no progress to show for its own efforts at integration.

108.    Moreover, an internet search for a generic graphic of a "photonic integrated circuit" did not locate the picture of Lidwave's PIC.  Plaintiff's counsel conducted a Google search of "photonic integrated circuit" for the year 2023 and was unable to find any pictures of Lidwave's PIC using those search terms.

109.    Additionally, a Google search of Lidwave's PIC image conducted by Plaintiff's counsel shows that, until the Forbes article breaking the story came out on March 17, 2023, that photo was only available on Lidwave's website.

110.    Accordingly, it is clear that Lidwave's PIC was deliberately sought out and placed in the slide, not mistakenly included.

### C.    Luminar Did Not Correct Its Deception Until Forced To Do So By Its Competitor

111.    The CEO of Lidwave, Yehuda Vidal, described how Luminar ignored his request to take down the offending image of his company's PIC chip and how he was forced to go to the SEC and the media to apply pressure to Luminar.  His story is reported in Times News:

> Vidal claims that Lidwave drafted and sent a letter to Luminar the next day, but it did not respond. On March 14, the company sent a cease-and-desist letter that demanded the company remove the image of its chip, and at the same time, sent a letter to the SEC, the US Securities and Exchange Commission, claiming that Luminar was allegedly misrepresenting its products to investors. Even to this, according to him, the giant did not respond. That's why Vidal decided to turn to the media, and only then did Luminar replace the problematic image. "After that (the broadcast), clients and investors

came to me who were very confused by the situation and thought that we might be buying from Luminar, maybe copying from them. This caused some confusion." According to him, Luminar does not have the ability to produce a product like his, and it is the only company in the world that has succeeded in inventing a physical method that enables the integration at the chip level.

**And what are your next steps?**
Vidal: "First of all, it's a copyright violation. ***It's also unfair competition. They're trying to present potential customers and investors with incorrect things to promote their product, and of course there's a misrepresentation here to investors and customers.*** It's a huge problem. All of this is riding on us. We are waiting for a response from them, and if there is no response, we will continue to take steps and get our remedy from a court."  (emphasis added)

112.    There is zero chance that Luminar's excuse that  it simply wanted to show a generic chip for this very specialized image is truthful. Such an attempt to cover up is evidence of scienter.

113.    Furthermore, the fact that Luminar removed from the internet all of the presentations and the slide show from Luminar Investor Day is evidence of scienter.

### D.    The PIC Was Luminar's Core Operation

114.    Because the fraud alleged herein relates to the core business of Luminar – scaling down lidar for consumer and commercial vehicles with the critically important PIC at the center of that strategy – knowledge of the facts underlying the fraudulent scheme may be imputed to the Individual Defendants.

115.    With respect to its Iris lidar, Luminar notes that it "features our
vertically integrated receiver, detector, and laser solutions developed by our
Advanced Technologies & Services segment companies - **Freedom
Photonics**, Black Forest Engineering, and Optogration. **The internal
development of these key technologies gives us a significant
advantage in the development of our product roadmap**." Freedom
Photonics in particular is essential to Luminar developing its product
roadmap because they manufacture photonic integrated circuits.   News
outlets have reported that Freedom Photonics manufactures a wide range of
photonic devices, including **photonic integrated circuits,** have commented
that photonic integrated circuits, in turn, are key to deploying LiDAR *en
masse*, and that lidar has the potential to hugely affect the world by helping
to prevent millions of automotive accidents.   Reporters also have reported
that to fully realize this potential, however, **the technology must meet all
the critical automotive performance and reliability requirements
while being inexpensive enough to deploy en masse**.   All-solid-state,
FMCW lidar powered by OPAs and **photonic integration is key to
making that happen**.

116.    In sum, PICs are essential to Luminar's mission of scaling down
LiDAR for consumer and commercial vehicles.

117.   Luminar's CFO, Thomas Fennimore, explained the importance of

Luminar Semiconductor to the broader company, stating, in relevant part:

> [Analyst]:  . . . You did announce the establishment of Luminar
> Semiconductor as its own brand and operation.  Can you talk to us
> about the product portfolio and how it helps Luminar as a whole?  And
> then what is the strategic rationale behind the platform?
>
> [Fennimore]: . . . as we scale up to meet our automotive customers'
> need, they need to scale up with them.  So bringing them in-house, we
> believe reduces execution risk.
>
> Number two, because we custom design these components for
> ourselves, we wanted to bring that in-house and expand our
> competitive moat. The third reason, and we didn't really realize this
> until we brought them all in-house, put Luminar jerseys on . . . and
> had them kind of sit around the product development table together is
> that there's real technology synergies. As we're kind of designing our
> next-generation LiDARs, having the laser, the ASIC and the chip guys
> sit in the same room and talking about how you get the most
> performance you can out of the LiDAR and particularly the
> components.
>
> Having them all work together, understand each other, better work
> toward the common goal, we're seeing a technology benefits that is
> going to manifest itself in our next-generation technology. And so,
> we've got all under the house. I would say this is the core components
> of our transceiver, which Fabrinet makes for us. And there are
> potential opportunities to grow that business over time outside of the
> LiDAR space because their technology is that good.

118.   Therefore, the Individual Defendants were in such a position at

the Company to access all material, non-public information concerning the

Company's newly formed subsidiary, Luminar Semiconductor, whose mission

was to "[e]nable[] Luminar to fulfill its mission." Given the importance of

Luminar Semiconductor and the chip-level up strategy to the Company, the

Individual Defendants would have been aware of whether the photograph

used in the slide depicting the PIC was the property of Luminar or was misappropriated from a competitor, *i.e.* Lidwave.

## IX.    LOSS CAUSATION

119.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial damages.

120.   During the Class Period, Plaintiff and other Class members purchased Luminar common stock at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Luminar common stock declined significantly causing Plaintiff and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

121.   Defendants made false and misleading statements and material omissions regarding Luminar's PIC device.  On the strength of these false and misleading statements and material omissions, the price of the Company's common stock was artificially inflated to a Class Period high of $9.89 on March 3 and March 6, 2023.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the

price of the Company's common stock served to maintain the share price at artificially inflated levels by maintaining and supporting a false perception of Luminar's business, operations, performance, and prospects. When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Luminar common stock declined.

122.    The true facts and risks regarding Luminar's PIC device which were omitted and/or misrepresented by Defendants eventually caused the price of Luminar's common stock to decline, thereby causing harm to investors.

123.    Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding Luminar's PIC device materialized, on March 17, 2023, when Forbes announced that Luminar had misappropriated an image of Lidwave's PIC in its Luminar Investor Day slideshow presentation. This caused investors to suffer losses because the price of Luminar's common stock plunged $0.78 per share, or 9.09%, over two consecutive trading days, to close at $7.80 per share on March 20, 2023.

124.    Accordingly, as a result of his purchases of Luminar's publicly traded common stock during the Class Period, Plaintiff and other members of the Class suffered economic losses and damages.

## X.    CONTROL PERSON LIABILITY

125.   The Individual Defendants are liable as direct participants with

respect to the wrongs complained of herein.  In addition, the Individual

Defendants, by reason of their status as senior executive officers and/or

directors, were "controlling persons" within the meaning of Section 20(a) of

the Exchange Act, and each had the power and influence to cause the

Company to engage in the unlawful conduct complained of herein.  Because of

their positions of control, the Individual Defendants were able to and did,

directly or indirectly, control the conduct of Luminar's business.

126.   Specifically, because of their positions within the Company, the

Individual Defendants possessed the power and authority to control the

contents of Luminar's statements and presentations to the market, including

those containing the materially false and misleading statements and

omissions of material fact alleged herein.  The Individual Defendants, by

reason of their management or board positions, had the ability and

opportunity to review copies of the Company's statements and presentations

alleged herein to be misleading, prior to, or shortly after their issuance or to

cause them to be corrected.

127.   By virtue of their positions, the Individual Defendants had access

to material non-public information.  The Individual Defendants knew or

recklessly disregarded the fact that the adverse facts specified herein had not

been disclosed and were being concealed from the public, and that the

positive representations which were being made were then materially false

and misleading.

## XI.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

128.    The false and/or misleading statements alleged herein were

material and public and at all relevant times the market for Luminar's

common stock was an efficient market for the following reasons, among

others:

a)    Luminar's common stock was listed on the NASDAQ Global
     Select Market, a highly efficient market;

b)    As a registered and regulated issuer of securities, Luminar filed
     periodic reports with the SEC, in addition to frequent voluntary
     dissemination of information;

c)    Luminar regularly communicated with public investors through
     established market communication mechanisms, including
     through regular dissemination of press releases on national
     circuits of major newswire services and through other wide-
     ranging public disclosures such as communications with the
     financial press and other similar reporting services;

d)    The market reacted to public information disseminated by Luminar; and

e)    At least 8 analysts followed Luminar's business and wrote reports which were publicly available and affected the marketplace.

129.    As a result of the above, the market for Luminar's common stock promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical trading prices and volumes of Luminar common stock are incorporated herein by reference.

130.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Luminar's common stock.  Without knowledge of the misrepresented or omitted facts, Plaintiff and other members of the Class purchased Luminar common stock between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Luminar's common stock was artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## XII.   AFFILIATED UTE PROVISION

131.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information the Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII.  NO SAFE HARBOR

132.   The safe harbor provisions for the forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

133.   First, the identified false and misleading statements and/or omissions herein are not a forward-looking statement, but instead is a

statement of current or historic fact, or is actionable in context because it omits then-existing material facts.

134.   Second, the identified false and misleading statements herein were not identified as a forward-looking statements.

135.   Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

136.   Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any technology company, and misleadingly contained no factual disclosure of any of the specific details concerning Luminar's PIC device, or similar important factors that would give investors adequate notice of such risks.

137.    Fifth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statements were false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by a director and/or executive officer of Luminar who actually knew that each such statement was false or misleading when made.

## XIV.  CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendants**

138.    Plaintiff re-alleges each allegation above as if fully set forth herein.

139.    This claim is brought under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), against Defendants.

140.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein concerning Luminar's PIC device, whose truth they knowingly or recklessly disregarded when they failed to

56

disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

141.   During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes, and artifices to defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiff and other members of the Class in that Defendants concealed that the photo of the PIC on the slide from Luminar Investor Day depicted a Lidwave PIC, not a Luminar PIC.

142.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

143.   Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

144.   As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class Members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

145.   Luminar is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Luminar in taking the actions alleged herein.

146.   Plaintiff and Class Members purchased Luminar common stock, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In so doing, Plaintiff and Class Members relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements. Plaintiff and Class Members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

147.   At the time of Defendants' false statements, misrepresentations and omissions, Plaintiff and Class Members were unaware of their falsity and believed them to be true.  Plaintiff and the Class would not otherwise

58

have purchased Luminar common stock had they known the truth about the

matters discussed above.

148.   Plaintiff is filing this action within two years after discovery of

the facts constituting the violation, including facts establishing scienter and

other elements of Plaintiff's claims, and within five years after the violations

with respect to Plaintiff's investments.

149.   By virtue of the foregoing, Defendants have violated § 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

150.   As a direct and proximate result of Defendants' wrongful conduct,

Plaintiff and the Class have suffered damages in connection with their

purchase of Luminar common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

151.   Plaintiff realleges each allegation above as if fully set forth

herein.

152.   This Count is asserted against the Individual Defendants for

violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf

of all members of the Class.

153.   As set forth above, Luminar committed a primary violation of

Section 10(b) of the Exchange Act by knowingly and/or recklessly

disseminating materially false and misleading statements and/or omissions
throughout the Class Period.

154.   The Individual Defendants, by reason of their status as senior
executive officers of Luminar, directly or indirectly controlled the conduct of
the Company's business and its representations to Plaintiff and the Class,
within the meaning of §20(a) of the Exchange Act.  The Individual
Defendants directly or indirectly controlled the content of the Company's SEC
statements and press releases related to Plaintiff's and the Class's
investments in Luminar common stock within the meaning of §20(a) of the
Exchange Act.  Therefore, the Individual Defendants are jointly and severally
liable for the Company's fraud, as alleged herein.

155.   The Individual Defendants controlled and had the authority to
control the content of the Company's public statements.  Because of their
close involvement in the every-day activities of the Company, and because of
their wide-ranging supervisory authority, the Individual Defendants
reviewed or had the opportunity to review these documents prior to their
issuance, or could have prevented their issuance or caused them to be
corrected.

156.   The Individual Defendants knew or recklessly disregarded the
fact that Luminar's representation was materially false and misleading

and/or omitted material facts when made.  In so doing, the Individual Defendants did not act in good faith.

157.   By virtue of their high-level positions and their participation in and awareness of Luminar's operations and public statements, the Individual Defendants were able to and did influence and control Luminar's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

158.   The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

159.   As set forth above, Luminar committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

160.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Luminar common stock.

## XV.  CLASS ACTION ALLEGATIONS

161.   Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and

entities other than Defendants that purchased or otherwise acquired

Luminar common stock between February 28, 2023 and March 17, 2023,

inclusive, and were damaged thereby, seeking to pursue remedies under the

Exchange Act.

162.    Excluded from the Class are the Defendants named herein,

members of their immediate families, any firm, trust, partnership,

corporation, officer, director or other individual or entity in which a

Defendant has a controlling interest or which is related to or affiliated with

any of the Defendants, and the legal representatives, heirs, successors-in-

interest or assigns of such excluded persons.

163.    The members of the Class are so numerous that joinder of all

members is impracticable.  During the Class Period, Luminar common stock

was actively traded on the NASDAQ Global Select Market, which is an

efficient market.  While the exact number of Class Members cannot be

determined at this early stage, Plaintiff believes that thousands of people

held Luminar common stock during the Class Period.  Record owners and

other members of the Class may be identified from records maintained by

Luminar or its transfer agent and may be notified of the pendency of this

action by mail, using a form of notice similar to that customarily used in

securities class actions.

164.    Plaintiff's claims are typical of the claims of the other members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

165.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the Class.

166.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, *inter alia*:

a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)    Whether statements made by Defendants during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c)    Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Luminar's common stock to be artificially inflated during the Class Period;

63

d)     Whether Defendants acted with the requisite level of scienter with respect to the Exchange Act claims;

e)     Whether McAuliffe is a controlling person of Luminar;

f)     Whether Russell is a controlling person of Luminar;

g)     Whether Eichenholz is a controlling person of Luminar;

h)     Whether reliance may be presumed pursuant to the *Affiliated Ute* presumption, fraud-on-the-regulatory process, or fraud-on-the-market doctrine for the Exchange Act Claims; and

i)     Whether the Class members have sustained damages, and if so, the proper measure of damages.

167.   Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

168.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## XVI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, pray for

relief and judgment including:

A.      Determining that Counts I through II of this action are a proper

class action under Federal Rules of Civil Procedure 23, certifying Plaintiff as

Class representative under Rule 23 of the Federal Rules of Civil Procedure,

and certifying Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the

other Class members against all Defendants, jointly and severally, for all

damages sustained as a result of Defendants' wrongdoing, in an amount to be

determined at trial, including pre-judgment and post-judgment interest, as

allowed by law;

C.      Awarding rescissory damages in favor of Plaintiff and the other

Class members where appropriate against all Defendants, jointly and

severally, for all injuries sustained as a result of Defendants' wrongdoing, in

an amount to be determined at trial, including pre-judgment and post-

judgment interest, as allowed by law;

D.      Awarding extraordinary, equitable, and/or injunctive relief as

permitted by law (including, but not limited to, rescission);

E.      Awarding Plaintiff and the Class their costs and expenses

incurred in this action, including reasonable counsel fees and expert fees; and

F.      Awarding such other and further relief as may be just and

proper.

## XVII. JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  July 8, 2024                    Respectfully submitted,


                                        By: */s/ Jeffrey L. Haberman*
                                              Jonathan R. Gdanski (FL. Bar No. 32097)
                                              Jeffrey L. Haberman (FL. Bar No. 98522)

                                        **SCHLESINGER LAW OFFICES, P.A.**
                                        1212 Southeast Third Avenue
                                        Fort Lauderdale, FL 33316
                                        Telephone: 954-467-8800
                                        Email:
                                        Jonathan@schlesingerlawoffices.com
                                        JHaberman@schlesingerlawoffices.com

                                        *Liaison Counsel for Lead Plaintiff*


                                        **FARUQI & FARUQI, LLP**
                                        James M. Wilson, Jr.
                                        Robert W. Killorin
                                        **FARUQI & FARUQI, LLP**
                                        685 Third Avenue, 26th Floor
                                        New York, NY 10017
                                        Telephone: 212-983-9330
                                        Facsimile: 212-983-9331
                                        Email: jwilson@faruqilaw.com
                                               rkillorin@faruqilaw.com


                                        *Attorneys for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2024, I caused a true and correct copy of

the foregoing to be filed with the Clerk of the Court using the CM/ECF system,

which will send electronic notification of such filing to all counsel of record.

By: _/s/ Jeffrey L. Haberman_
Jeffrey L. Haberman
(FL. Bar No. 98522)