IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| JOHN ALMS, Individually and on Behalf of All Others Similarly Situated, | Case No.:  6:23-cv-982-JSS-LHP |
| Plaintiff,<br>v. | THIRD AMENDED CLASS ACTION COMPLAINT |
| LUMINAR TECHNOLOGIES, INC. and MIKE MCAULIFFE | DEMAND FOR A JURY TRIAL |
| Defendants. | |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................... 1

II.     FACTUAL BACKGROUND ...................................................... 4

III.    JURISDICTION AND VENUE................................................. 16

IV.     THE PARTIES AND RELEVANT NON-PARTIES............................. 17

        A.      Lead Plaintiff ............................................................. 17

        B.      Defendants ................................................................. 17

        C.      Relevant Non-Parties ................................................ 20

V.      TECHNOLOGICAL BACKGROUND OF THE CLAIMS ................... 20

        A.      Lidar Technology ....................................................... 20

        B.      The Background of Luminar and Luminar Semiconductor ........ 24

        C.      Lidwave ..................................................................... 29

VI.     CLASS PERIOD FALSE AND MISLEADING STATEMENTS ........... 35

VII.    THE TRUTH ABOUT LUMINAR'S "CHIP" IS DISCLOSED ............. 38

VIII.   EXPERT ANALYSIS CONFIRMS THAT LUMINAR'S CHIP
        DID NOT HAVE THE SAME CAPABILITIES AS THAT
        PICTURED DURING INVESTOR DAY ................................... 43

        A.      Dr. Lebby's Qualifications And Experience.................... 43

        B.      Dr. Lebby's Analysis ................................................. 46

IX.     ADDITIONAL SCIENTER ALLEGATIONS ........................... 53

        A.      *Respondeat Superior* and Agency Principles Apply .................... 53

        B.      McAuliffe Knew Or Was Reckless In Not Knowing That The
                PIC Pictured In The PowerPoint Presentation Was
                Manufactured By Lidwave ........................................ 53

        C.      Luminar Did Not Correct Its Deception Until Forced To Do
                So By Its Competitor And It Was Deceitful In Doing That......... 58

        D.      The PIC Was Luminar's Core Operation ..................... 60

X.      LOSS CAUSATION .............................................................. 63

XI.     CONTROL PERSON LIABILITY.......................................... 65

i

XII.   APPLICABILITY OF THE FRAUD ON THE MARKET
       DOCTRINE .......................................................................... 66

XIII.  AFFILIATED UTE PROVISION .......................................... 68

XIV.   NO SAFE HARBOR ............................................................ 68

XV.    CLAIMS FOR RELIEF ....................................................... 70

XVI.   CLASS ACTION ALLEGATIONS ....................................... 75

XVII.  PRAYER FOR RELIEF ....................................................... 78

XVIII. JURY TRIAL DEMAND ..................................................... 79

Lead Plaintiff John Alms ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's third amended complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Luminar Technologies, Inc. ("Luminar" or the "Company"), analysts' reports and advisories about the Company, information from a confidential witness, information from Michael Lebby, PhD, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a federal securities class action that stems from statements made and images shown to investors by Defendants on Luminar Investor Day, which was held on February 28, 2023.

2.     The false narrative giving rise to this case was exposed almost immediately because investors and clients watching the Investor Day presentation recognized that the advanced photonic integrated circuit ("PIC") chip that Luminar displayed looked exactly like that of another company, Lidwave.  Those investors and clients alerted Lidwave's CEO.  Realizing that Luminar had misappropriated the image of his advanced silicon PIC chip, the CEO immediately complained to the SEC, threatened litigation, and the entire story was covered by Forbes and carried in other news outlets. Luminar later removed the image and replaced it with a microscopic blowup image of part of one of its own chips, perhaps hoping the extreme magnification would mask what it really was.

3.     However one of the most prominent experts in the industry, Dr. Michael Lebby,[1] has now reviewed both images and opined that "***the PIC chip design by Lidwave that Luminar used in its Investor-day presentation demonstrates a high degree of sophistication and integration that could greatly lower the cost of manufacturing and performance of the Lidwave device.  I believe that knowledgeable investors attending Luminar Investor Day would have recognized this***

_____

[1]     Dr. Lebby's expert report (the "Lebby Report"), which includes his background qualifications, is incorporated by reference and attached hereto as Exhibit 1.

*feature and have been led to believe that Luminar was indeed succeeding in developing cutting edge PIC chips."* Dr. Lebby went on to opine on the substituted chip image: *"In stark contrast, the image of the chip that Luminar claimed to be its own appears to be not silicon photonics at all, but a InP[2] tunable laser chip. Also, it is not clear why Luminar would show a InP laser chip when conveying a solution in silicon photonics to its investor base. InP is not as scalable in cost compared to silicon photonics which benefits from the existing silicon foundry infrastructure with larger format silicon wafers that is available globally."*

4.    The answer to Dr. Lebby's question—that is, why Luminar was unable to replace the pilfered silicon PIC in its presentation with its own silicon PIC, and had to use a non-PIC InP laser chip instead—may lie in an admission Luminar made in response to SEC questioning just a few months earlier. The SEC was apparently concerned about the tenor of Luminar's previous claims about its capabilities sent the company a series of written questions. In response, Luminar admitted that key components were not really complete and ready for market, telling the SEC in December 2022 that, *"[a]t the end of 2021, the Company neither achieved technological*

---

[2]    InP is Indium Phosphide.

*feasibility of its developed software nor achieved a level of certainty to anticipate imminent sales of commercial grade series production lidar sensors and had not commenced sales of commercial grade series production of its lidar sensors."* Luminar Investor Day, however, was an opportunity to show that Luminar had made substantial progress towards technological feasibility, and having an advanced silicon PIC chip would make the Company appear closer to that goal.

5.    Indeed, Defendant McAuliffe in his presentation talked of great "broader opportunity" and said in an offhand manner that he believed that Luminar "will be clearly the market leader in lidar." Nothing could have been further from the truth. A mere year and a half later, after a long downhill slide, Luminar stock traded at under $1.00 for over thirty days and on October 21, 2024 Luminar was given a notice of delisting by NASDAQ. Rather than face delisting, Luminar did a reverse stock split of 15 to 1 to keep the stock price above $1.00. An investor that purchased a share of Luminar on Investor Day 2023 at the closing price of $134.25 would have lost 94% of their investment by the date of this filing, January 10, 2025 when the stock closed at $7.40. The Investor Day hype was not real.

## II.    FACTUAL BACKGROUND

6.    This federal securities class action is brought on behalf of a class consisting of all persons and entities other than Defendants that purchased

or otherwise acquired Luminar securities between February 28, 2023, and March 17, 2023, both dates inclusive (the "Class Period"). Plaintiff is seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its senior executives.

7.    Luminar was founded in 2012 and is focused on creating lidar sensors (light detection and ranging sensor) for autonomous vehicles. Lidar sensors are remote, laser scanning systems that can be used to provide directional images for vehicles offering autonomous features by providing a high-resolution 3D view of the vehicle's surroundings.

8.    Luminar has lost money every year since it went public. As Luminar admitted to the SEC in December 2022, "[a]t the end of 2021, ***the Company neither achieved technological feasibility of its developed software nor achieved a level of certainty to anticipate imminent sales of commercial grade*** series production lidar sensors and had not commenced sales of commercial grade series production of its lidar sensors." *See* Exhibit 2 (quotation at 5).

9.    It is widely acknowledged that to get ahead in the highly competitive autonomous vehicle industry, making smaller and more cost efficient lidar systems is key. Thus, in recent years, lidar manufacturers have

been competing to scale down the size of the traditional sensor.  Critical to this miniaturization process has been the development of photonic integrated circuits ("PICs").  PICs are small chips that generate the laser beams and conduct the scanning function in lidar sensors.  Indeed, panelists from the Optical Fiber Communication Conference in 2023 "all agreed on the fundamental notion that for [LiDAR] technology to reach the scale that automotive applications require, then the miniaturization driven by chip-scale photonic integration is a mission-critical goal."

10.    Luminar was keenly aware that its focus would need to be on manufacturing PICs in order to achieve that "mission-critical goal," and that numerous competitors were all vying for the same investor capital.  Luminar's future success depended in part on convincing investors that its technology would prevail.

11.    To that end, Luminar "acquired Freedom Photonics, a high-performance laser manufacturer from Santa Barbara, CA, in March 2022.  The company's high-powered laser and ***their related photonic integrated circuit technologies*** will help optimize Luminar's performance and advance the cost roadmap of their future sensors, explained Luminar co-founder and chief technology officer Jason Eichenholz."  Eric Van Rees, *Why Photonic Lidar is the Next Step for Autonomous Navigation in Automotive* (Feb. 8, 2023), Geo Week News.

6

12.    Additionally, making PICs out of silicon greatly improves the scalability of lidar technology because it allows for the miniaturization and integration of the necessary optical components onto a single chip, leading to smaller, more cost-effective lidar systems.  These systems leverage silicon's semiconductor properties to create compact, efficient laser manipulation and detection mechanisms, which are essential for advanced applications like autonomous vehicles.

13.    On December 22, 2022, Luminar announced that it would be hosting its first-ever Luminar Investor Day conference on February 28, 2023, at its headquarters.  "At the event," which was to be held for consumers, investors, customers and suppliers, Luminar planned to "unveil its long-term product and technology roadmap for existing and new [original equipment manufacturer] customers."

14.    A pivotal theme of the Luminar Investor Day presentation was that Luminar was aggressively making progress in shrinking the size of its components and lowering the cost.

15.    As shown in the graphic below, Luminar was promising investors next generation equipment that would be smaller and more advanced than previous products.



16.     The Investor Day conference would feature, among other things, a presentation from Michael McAuliffe ("McAuliffe"), CEO of Luminar's new subsidiary, Luminar Semiconductor, made up of Freedom Photonics and two other companies Luminar acquired, Black Forest Engineering and Optogration, Inc.  As McAuliffe would explain, Luminar Semiconductor was very important to the Company, as the subsidiary's mission was to "[e]nable[] Luminar to fulfill its mission."

17.     According to a former Senior Executive Assistant who worked with McAuliffe, Investor Day was a "big deal" and preparations for it began months before the actual event.  McAuliffe was involved in preparing the presentation and had access to and was able to edit the presentation before Investor Day.

18.     During his portion of the presentation, McAuliffe boasted that through the use of its proprietary semiconductor technology, Luminar has been able to develop a higher power laser with longer detection range and

increased accuracy, while also minimizing costs.

19.    While making these and other statements, McAuliffe presented a
slide entitled "Common Platforms Drive Scale" to complement his discussion
of the Company's focus on driving the economies of scale by engineering
smaller, more powerful PIC chips that could be mass produced economically.
Such chips would incorporate more and more functions at a lower cost
because they are silicon chips, as opposed to more bulky wired circuits and
hardware.   McAuliffe referred to this process as "siliconization."  This slide
included an impressive color image of Luminar's "siliconized" PIC chip:



20.    To analyze the chip displayed, Plaintiff retained Dr. Michael Lebby,
Ph.D, who has over 40 years of experience in electronics and photonics.

21.    In his distinguished forty-year career, Dr. Lebby has served in a
number of technical and managerial roles.  He recently retired as Chairman
and CEO of a publicly traded company (Lightwave Logic Inc.
NASDAQ:LWLG) and has stated that he is acutely aware of shareholder and
investor expectations from a publicly traded technology-based company.

22.     Dr. Lebby also serves as a Technical Expert/Consultant for the European Commission, where he, *inter alia*, advises on general photonics, silicon photonic PICs, and semiconductors.  Dr. Lebby confirmed that the image featured in the slide shows a silicon photonics PIC chip with advanced circuitry: "***the PIC chip design by Lidwave that Luminar used in its Investor-day presentation demonstrates a high degree of sophistication and integration that could greatly lower the cost of manufacturing and performance of the Lidwave device.***"

23.     Given the context in which it was presented, there can be no doubt that the PIC McAuliffe displayed was intended to be a representation of Luminar's current technology.  Dr. Lebby opined:  "***I believe that knowledgeable investors attending Luminar Investor Day would have recognized this feature and have been led to believe that Luminar was indeed succeeding in developing cutting edge PIC chips.***"

24.     Indeed, knowledgeable investors ***did*** recognize this feature, as explained further below.

25.     Notably, the CEO of one of Luminar's competitors, Sumit Sharma of MicroVision, was incredulous about the technology Luminar displayed on Investor Day, stating that Luminar was playing a game of "fake it till you make it" with respect to its technology. It was clear he was referring to Luminar because he mentioned that the competitor "admitted to the SEC that their

technology has not shown viability yet and contracts are not guaranteed," but "cause[s] a lot of market confusion with extensive marketing events and press releases" and are able to "raise huge amounts of capital from the market" that they use for, *inter alia*, "buying $80 million mansions in Pacific Palisades."[3] When asked directly about Investor Day, he suggested that Luminar may not have much more than Computer Aided Design graphics.

26.    This would prove prescient.  The truth began to come out on Friday, March 17, 2023, when half and hour before the market closed, Forbes published an article entitled "Lidar Maker Luminar Accused of Using Image of Rival's Chip In Investor Conference" (the "Forbes Article").  The Forbes Article reported that Lidwave had sent a cease-and-desist letter to Luminar accusing Luminar of passing off Lidwave's PIC as its own in its Luminar Investor Day presentation and reported that Lidwave was considering pursuing legal action. The Forbes article also reported that Lidwave had "also notified the Securities and Exchange Commission of Luminar's 'misuse of its product image to falsely promote its abilities and securities to investors.'"

27.    The stock began to drop that day, but more news was yet to come. Over the weekend, on Sunday, March 19, 2023, Forbes updated its article to

---

[3]     Mr. Russell bought such a mansion. *See* Lauren Beale, *The Most Expensive U.S. Real Estate Sales for 2021*, Forbes (Jan. 16, 2022), https://www.forbes.com/sites/ laurenbeale/2022/01/16/most-expensive-us-real-estate-sales-2021/.

include an image of Luminar's actual chip and contained a quote from a Luminar representative that it "removed and replaced that image with an image of a new Luminar Semiconductor photonics integrated circuit." Notably, the updated presentation[4] does not inform investors that any slides have been changed from the original presentation.

28. The chip featured in the updated photo (pictured below) appears to be a larger, bulkier, and much less sophisticated chip design than that shown on Luminar Investor Day. In fact, Dr. Lebby explains that the image used to portray Luminar's actual chip is clearly ***not a silicon PIC*** at all, but a chip with 28 electrical wire bonds that appears to be a tunable laser chip fabricated on an Indium Phosphide ("InP") wafer.



---

4        Available here: https://www.youtube.com/watch?v=-OL-8bML7Sg.

29.    The fact that Luminar had no new PIC chip of its own to display
would have come a no surprise to SEC to whom Luminar had recently
admitted that Luminar *"had not commenced sales of commercial grade
series production of its lidar sensors."*    However it would have been very
surprising to unsuspecting potential investors at Investor Day who were
following along with Luminar's boasting of its great advancements.That same
day, the CEO of Lidwave, Yehuda Vidal, was interviewed in an article for
Time News titled "An Israeli entrepreneur was surprised to discover the chip
he had developed in a presentation of the major competitor."  In the article,
Mr. Vidal is quoted as stating that after Luminar Investor Day, "clients and
investors came to me who were very confused by the situation and thought
that we might be buying from Luminar, maybe copying from them. This
caused some confusion."  This is further evidence that the PIC design was
readily recognized and is material and significant to knowledgeable investors.
The article goes on to state that according to Mr. Vidal, "Luminar does not
have the ability to produce a product like his, and [Lidwave] is the only
company in the world that has succeeded in inventing a physical method that
enables the integration at the chip level."

30.    The revelation of the true state of Luminar's technology led the
stock to drop further.  Shortly after market open on March 20, 2023,
TheFlyontheWall.com published an article titled, "LAZR: Luminar accused of

13

passing off next-gen chip design of rival as own, Forbes says," linking to the updated Forbes article that contained Luminar's actual chip.

31.     Later that day, SeekingAlpha published another article commenting on the situation, noting that "[s]hares of Luminar Technologies (LAXR) fell 7.90% on Monday in a deeper drop than LiDar peers."

32.     In total, Luminar's stock price fell 9.09% over two consecutive trading days to close at $7.80 per share on March 20, 2023.

33.     In light of the "volatility" of its share price following these revelations, and "other lidar companies stepping up their public attacks on us," Luminar issued a statement on its blog titled "Addressing Misconceptions with Facts." This in and of itself shows the materiality of this issue to investors. In its statement, Luminar stated, "as part of our Luminar Day, a member of our team included a thumbnail of a generic graphic of a photonic integrated circuit[,]" which "was there to give a visual illustration of a generic photonic integrated circuit in our semiconductor section of the presentation." Referring to Lidwave, the blog continued, "[a] startup company that Luminar has never heard of contacted the media claiming that we were improperly passing off their tech as ours. This is clearly not the case." The blog post was attributed to "Tom [Fennimore] and the rest of the Luminar Team."

34.    Luminar's explanation is not plausible.  It was clear in the context of the presentation that the PIC displayed was meant to illustrate Luminar's proprietary technology to investors, not "generic" chips.  Moreover, an internet search for a generic graphic of a "photonic integrated circuit" did not locate the picture of Lidwave's PIC.  Luminar had to intentionally seek out and locate the graphic which was a perfect complement for its false claims of advanced technology.  Additionally, Plaintiff's counsel conducted a Google search of "photonic integrated circuit" for the year 2023 and was unable to find any pictures of Lidwave's PIC using those search terms.

35.    A Google search of Lidwave's PIC image conducted by Plaintiff's counsel shows that, until the Forbes article breaking the story came out on March 17, 2023, that photo was only available on Lidwave's website.

36.    Accordingly, it is clear that Lidwave's PIC was deliberately sought out and placed in the slide, not mistakenly included.

37.    Furthermore, the fact that Luminar could not replace the image of Lidwave's PIC with anything remotely similar supports that Lidwave's image was chosen intentionally to make Luminar's technology appear more advanced than it was with respect to the metric that mattered most to get ahead of the competition: cost effective scalability.  Indeed, the chip image Luminar used to replace Lidwave's image was ***not silicon photonics*** at all.

38.    Indeed, although the updated Forbes article provided a quote from

15

a Luminar representative that "[w]e have removed and replaced that image with an image of a new Luminar Semiconductor photonics integrated circuit," Luminar's blog post a few days later described it as a photo "of one of our integrated circuits" – *i.e.*, not a PIC.

39.    The fact that Luminar's technology for this kind of chip was not as advanced in this area as that of Lidwave would have been apparent to investors had Defendants instead displayed the image of Luminar's bulky technology.    ***The actual Luminar chip image would have belied the narrative given by McAuliffe and the other speakers during Investor Day, as it would have informed investors that Luminar was not even close to a design that could achieve Luminar's stated goals of true "siliconization" and scalability.***

## III.    JURISDICTION AND VENUE

40.    This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

41.    This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

42.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Luminar's principal executive office is located in Orlando, Florida, which is situated in

this District, and the alleged activity and subsequent damages took place in this Judicial District. Pursuant to Luminar's Prospectus Summary filed with the SEC on September 8, 2023, as of July 31, 2023, Luminar had 293,291,160 and 97,088,670 shares of Class A and Class B common stock outstanding, respectively. Accordingly, there are presumably hundreds, if not thousands, of investors in Luminar's common stock located in the U.S., some of whom undoubtedly reside in this District.

43.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    THE PARTIES AND RELEVANT NON-PARTIES

### A.    Lead Plaintiff

44.    As shown in his PSLRA Certification, Lead Plaintiff John Alms purchased Luminar common stock at artificially inflated prices during the Class Period and was injured thereby.

### B.    Defendants

45.    Defendant Luminar is a Delaware corporation with principal executive offices located at 2603 Discovery Drive, Suite 100, Orlando, Florida

32826. The Company's common stock trades on the NASDAQ Global Select

Market under the ticker symbol "LAZR."

46.    Defendant McAuliffe has served as the CEO of Luminar's

subsidiary, Luminar Semiconductor, from October 2022 to the present.  As

the CEO, McAuliffe ran the day-to-day operations of Luminar Semiconductor.

47.    McAuliffe, because of his position with the Company, possessed

the authority to control, correct, and/or update the contents of Luminar's

public disclosures to the market.  McAuliffe had the duty to exercise due care

and diligence and the duty of full and candid disclosure of all material facts

relating to the Company's financial results and operations.  McAuliffe further

had the duty to correct and/or update any previously issued statements that

were untrue or became materially misleading or untrue, so that the market

price of the Company's publicly traded common stock would be based upon

truthful, complete, and accurate information.  To discharge his duties,

McAuliffe was required to exercise reasonable and prudent supervision over

the dissemination of information concerning the Company's financial results

and operations.  By virtue of such duties, McAuliffe was required, *inter alia*,

to:

    a)    conduct and supervise the business of Luminar in accordance

            with federal laws;

b)      supervise the preparation of Luminar's SEC filings and approve

any reports concerning Luminar's financial reporting and results;

and

c)      ensure that Luminar established and followed adequate internal

controls.

48.      As an officer and a controlling person of a publicly-held company

which is registered with the SEC under the federal securities laws and the

securities of which were traded on the NASDAQ and governed by the

provisions of the federal securities laws, McAuliffe had a duty to (1) promptly

disseminate complete, accurate and truthful information with respect to the

Company's financial statements and operations; (2) correct any previously

issued statements that were materially misleading or untrue so that the

market could accurately price the Company's publicly traded securities based

upon truthful, accurate, and complete information; and (3) update any

previously-issued statements that became materially misleading or untrue so

that the market could accurately price the Company's publicly traded

securities based upon truthful, accurate, and complete information.

49.      Luminar and McAuliffe are primarily liable for the

misrepresentations and misleading statements alleged herein and McAuliffe

is also liable as controlling person of Luminar.  The scheme deceived the

investing public regarding Luminar's financial condition, which caused

19

Plaintiff and other members of the Class to purchase Luminar common stock
at artificially inflated prices during the Class Period and suffer damages as a
result.

### C.    Relevant Non-Parties

50.    Austin Russell is the founder of Luminar and at all relevant
times served as the Company's president, CEO, and chairman of the board of
directors.

51.    Dr. Jason Eichenholz ("Eichenholz") is the Chief Technology
Officer ("CTO") of Luminar and Chairman of the subsidiary Luminar
Semiconductor.

52.    CW 1 is a former Senior Executive Assistant at Luminar from
October 2022 to September 2024.  CW 1 participated in the Luminar Day
presentation through CW 1's role providing executive assistance to McAuliffe
and Executive Vice President Taner Ozcelik.

## V.    TECHNOLOGICAL BACKGROUND OF THE CLAIMS

### A.    Lidar Technology

53.    Luminar is in a highly competitive industry.  It is in competition
with over twenty other companies globally, all trying to quickly advance lidar
technology which can be used in the growth industry of autonomous and
semi-autonomous vehicles.

54.     Lidar (light detection and ranging; a photon-based version of radar) is a remote sensing technology that leverages laser light to measure distances and construct maps of the environment.  Lidar operates by emitting laser pulses and determining the time elapsed for the pulses to reflect off objects and return to the sensor.  This data is used to create 3D models of its surroundings.  Lidar technology finds application in multiple sectors, such as autonomous vehicles, geography, archaeology, and meteorology.

55.     In cars in particular, lidar technology helps the vehicle sense and understand its surroundings.  The technology uses laser pulses to create 3D mappings of its environment, including objects like buildings, roads, and other vehicles.  This information is then combined with other data to ensure safe navigation.  The technology is primarily used in advanced driver-assistance systems and operation of autonomous vehicles.

56.     A typical lidar system will require a mechanical system that physically moves the light source around to scan the environment.  This could be as simple as a 360-rotating lidar scanner or may involve the use of small scanning mirrors to steer the beam.  Lidar systems have traditionally been large and bulky.  Below is a picture of an early version of a self-driving car with a lidar sensor attached to the roof of the vehicle:



57.    In recent years, lidar manufacturers have started using more advanced PIC chips to scale down the size of the traditional lidar sensor. PICs contain photonic components that work with light (photons).  PICs are used to replace the beam-steering part of the lidar, through the use of optical phased arrays.  Optical phased arrays steer or operate laser beams.  Such optical phased arrays can shape the laser beam and steer it fast for video-rate three-dimensional imaging.

58.    Below is a schematic of an optical phased array, using optical phase control (left) and wavelength control (right) for beam steering:

59.    PICs offer advantages such as miniaturization, higher speed, low thermal effects, large integration capacity, and compatibility with existing processing flows that allow for high yield, volume manufacturing, and lower prices.  Therefore, given the advantages of using PICs in lidar sensors, technology companies have been in a race to create the sleekest, most economical PICs for lidar that can be scaled for mass production at low cost. Panelists at the Optical Fiber Communication Conference 2023 in San Diego "all agreed on the fundamental notion that for [LiDAR] technology to reach the scale that automotive applications require, then ***the miniaturization driven by chip-scale photonic integration is a mission-critical goal.***"

60.    Indeed, currently the biggest obstacle holding back large-scale production of lidar for use in vehicles is the cost of assembling such complex components with extreme precision.  Scaling the production of the devices remains a challenge for manufacturers, and therefore, integrating as many

functions into smaller, more advanced PIC chips was important in the

advancement of the technology and lowering costs of production.  It would be

well understood by investors that advances in the state of design of

Luminar's PICs to make them more powerful and to integrate more functions

(not unlike what Intel Corp. has done with its processors for home computers)

would be critical to the success of the Company.

**B.    The Background of Luminar and Luminar Semiconductor**

61.    Luminar describes itself as "a global automotive technology

company . . . . building from the **chip-level up**, our light detection and

ranging sensor, or lidar, which is expected to meet the demanding

performance, safety, reliability and cost requirements to enable next

generation safety and autonomous capabilities for passenger and commercial

vehicles as well as other adjacent markets."  The Company has the following

two operating segments:

a)    "Autonomy Solutions" for automotive applications, which

includes manufacturing and distribution of lidar, non-recurring

engineering services related to the Company's lidar products, and

development of software products that enable autonomy

capabilities.

b)    "Advanced Technologies and Services ("ATS")" which includes

development of application-specific integrated circuits, pixel-

based sensors, advanced lasers, as well as designing, testing and
providing consulting services for non-standard integrated
circuits.

62.    To obtain the capabilities and intellectual property to develop its
lidar products from the chip-level up, beginning in 2018, Luminar began
acquiring semiconductor companies.  Indeed, in April 2018, Luminar
acquired Black Forest Engineering ("Black Forest"), which gave Luminar
access to Black Forest's Indium Galluim Arsenide receiver chips which are
used to detect the 1550 nm light around which the lidar systems are based.[5]
On August 3, 2021, Luminar acquired Optogration, Inc. ("Optogration"),
which allowed Luminar to secure the intellectual property and supply of
Indium Galluim Arsenide photodector chips which are used to convert optical
power into an electrical current.  On April 13, 2022, Luminar completed its
acquisition of Freedom Photonics, which allowed Luminar to secure
intellectual property and the supply of a key enabling component for photonic
products.  Speaking about the acquisition, CTO Eichenholz stated that
"[b]ringing Freedom Photonics into Luminar enables a new level of economies
of scale, deepens our competitive moat and strengthens our future technology

---

[5]    1550 nanometers is a measurement of the wavelength of the laser used
in the lidar.

roadmap . . . . We've worked closely with the Freedom team for the past
several years."

63.    In February 2023, Luminar consolidated its three chip design
subsidiaries – Black Forest, Optogration, and Freedom Photonics – into a
new entity named Luminar Semiconductor.  Luminar Semiconductor is
focused on the mission of fueling advancements for Luminar's next-
generation sensors, including developing PIC chips, while simultaneously
leveraging these advanced semiconductor technologies for other applications
and industries.

64.    McAuliffe was appointed as the CEO of Luminar's subsidiary,
Luminar Semiconductor.  During his presentation at Luminar Investor Day,
McAuliffe stated that the mission of Luminar Semiconductor was "to take
those [three companies] into an integrated company and to take them to the
next level, the next level of capabilities, the next level of products, to drive
the current and future Luminar roadmaps, but importantly, also to create a
broader ambition to be a photonics player in the wider market" and that, at
its core, Luminar Semiconductor "build[s] chip scale components and chip
scale optoelectronic engines to solve really impactful problems for the world
working with industry leaders," number one being "Luminar, our number one
customer[,] solving probably the most impactful problem of them all[:]" a
smaller, scalable lidar sensor for passenger and commercial vehicles.

26

65.     As the first slide of McAuliffe's presentation made clear, the

purpose of Luminar Semiconductor was to "[e]nable[] Luminar to fulfill its

mission" of developing an economically advantageous lidar for passenger and

commercial vehicles:



66.     The development of an advanced PIC is critical to the success of the

company and is integral to the products the company intends to bring to

market.

67.     Luminar Semiconductor is not just limited to servicing consumer

and commercial vehicles, but additionally to developing technology that "can be

applied to other markets, other customers [who] have similar problems, who are

generating photons, detecting photons, processing photons, they recognize how

difficult it is, what value we can create, so they're also interested, and we can

create broader opportunities across wider markets."

68.     As one analyst report put it, Freedom Photonics, Black Forest

Engineering, and Optogration were merged to "enhance [Luminar's] supply

chain capabilities" and provide semiconductor products to a wider market.

Indeed, Luminar Semiconductor was created "in an effort to industrialize

Luminar's photonics and optoelectronics based technologies to cater to

opportunities in Datacom/Telecom, Aerospace, Precision Manufacturing and

Life Sciences together making a TAM [total addressable market] of over $50

bn."

    69.    News outlets made special note of the creation of this new

Luminar subsidiary.  On February 28th, one news outlet noted that, "[t]he

Company also announced a series of ambitious expansion plans, including . . .

a semiconductor subsidiary. . . . The Company announced the combination of

its chip design subsidiaries Black Forest Engineering, Optogration, and

Freedom Photonics into a new unified entity, Luminar Semiconductor." The

following month, another news outlet noted that "the advanced receiver, laser

and processing chip technologies provided by this entity [Luminar

Semiconductor] are not limited to lidar-based applications."

    70.    The importance of this segment of Luminar's business, dedicated

to the development of semiconductor technology, cannot be overstated.  As of

June 30, 2023, ATS, which is the "segment [that] is in the business of

development of semiconductor technology based lasers and sensors" that "also

designs, tests, and provides consulting services for development of integrated

circuits[,]" was $73,664,000, a significant portion – over 9% – of Luminar's assets.

71.    With such big expenditures to acquire smaller companies, the expectations for great progress in chip integration were very high, and the graphic of Luminar's actual chip would make clear that those expectations had not been met.

72.    Rather that admit the truth, it appears certain that Luminar intentionally targeted and borrowed an image from its competitor, Lidwave, that had been focused for many years on the type of chip integration Luminar was touting but did not possess.

**C.    Lidwave**

73.    Lidwave is a start-up company based in Jerusalem, Israel, that develops high-performance, scalable, LiDAR-on-a-chip sensors.

74.    LiDAR-on-a-chip solves problems posted by traditional lidar devices, which are expensive, bulky, contain moving parts, and are difficult for commercialization.  LiDAR-on-a-chip integrates all the optical components necessary for lidar (*i.e.*, it uses integrated photonics) onto a single photonic chip, allowing for faster production at a lower cost per chip.

75.    According to Lidwave, its Finite Coherent Ranging architecture—its core technology—allows it to integrate all optical parts at

the chip level, which is what is demonstrated in the picture below (Figure 1) of the Lidwave PIC:



76.    Mr. Vidal, Lidwave's CEO, said that Luminar and its other competitors were watching his company's pioneering work in PIC chip integration.  "[I]t's the holy grail in the field of lidar. Everyone dreams of reaching it . . ."

77.    According to Lidwave, ***Luminar does not have the ability to produce a product like their PIC chip in the stolen image, and the image itself make clear that the PIC chip pictured incorporates advanced technology***.  Lidwave stated that: "After intensive R&D we have invented the Finite Coherent Ranging - FCR™ architecture (Lidwave's core IP). This technology allows us to integrate all optical parts at the chip level,

*as demonstrated in the Lidwave product image* that Luminar copied without our permission."

78.    After the Forbes article came out, Luminar removed its entire Luminar Investor Day presentation video, from the internet.  It has recently been reposted, but without notice that the content was changed by removing the offending image taken from Lidwave.Background of Luminar Investor Day

79.    On December 22, 2022, Luminar announced that it would be hosting its first-ever Luminar Investor Day conference on February 28, 2023, at its headquarters.  "At the event," which was to be held for consumers, investors, customers and suppliers, Luminar planned to "unveil its long-term product and technology roadmap for existing and new [original equipment manufacturer] customers."

80.    According to CW 1, a former Senior Executive Assistant at Luminar from October 2022 to September 2024, preparations for the 2023 Luminar Day presentation probably began six months prior to the actual event, which reflected that it was "a big deal."  According to CW 1, when it came to preparing slides for use in presentations such as to the Luminar Board or at a conference like Luminar Day, "everyone" in the executive staff had their "own part to play."  For instance, McAuliffe's part of the Luminar

Day presentation would have been more "to sell" Luminar to investors.  His

part of the presentation also included showing pictures of what Luminar's

technology used to look like, say, ten years prior, then five years further

along, and currently, including that the technology was getting "even smaller

and more condensed."

81.    According to CW 1, generally when PowerPoint slides for, say,

Board presentations, Luminar Day, and company All-Hands meetings, were

prepared, the drafts were usually reviewed and possibly changed by

McAuliffe.

82.    When a presentation like Luminar Day, a company all-hands

meeting, or a Quarterly Business Review was being prepared, CW 1 would

reach out to the direct contributors and tell them that materials needed to be

sent to McAuliffe and/or Ozcelik by a certain date.  Three of the main

contributors that submitted materials to McAuliffe were personnel who were

part of several companies that Luminar had acquired and which became the

basis for Luminar Semiconductor.

83.    CW 1 stated that as contributions came in from Ozcelik's and

McAuliffe's direct reports, CW 1 created a folder and a document accessible to

those working on the presentation, and would notify McAuliffe, Ozcelik and

their direct reports that "here is the first draft" so they could make changes

to it as necessary.

84.    Analysts anticipated that the Company would discuss its financial updates and progress on economizing its lidar technology. Deutsche Bank expected that Luminar would "initiate 2023 guidance, update investors on its progress towards scaling production and reducing BoM leading to refreshed mid-decade revenue and margin targets, and perhaps share an updated vision for the company by 2030." J.P. Morgan, meanwhile, expected that "[t]he longer-term implications of the series production milestone in terms of greater confidence from customers in adopting the product across more vehicle models, will likely be more evident at Luminar's investor day update early next year."

85.    At Luminar Investor Day, Company executives and third-party industry leaders discussed Luminar's vision and execution as well as the industry's move toward next-generation technology.

86.    Luminar unveiled the long-anticipated Iris+ lidar sensor which offers a slimmer profile for more seamless integration into vehicle rooflines compared to its predecessor, Iris, and is expected to hit series production vehicle integration in 2025 as reflected in below slide.



87.    Luminar also claimed that its Iris lidar technology was planned to be implemented in over 20 production vehicles across multiple automakers, and is expected to garner at least triple-digit revenue growth each year for the next five years.

88.    Luminar also debuted its new subsidiary, Luminar Semiconductor, as explained above and in further detail below.

89.    The unknowing market's reaction to Luminar Investor Day was very positive.  Analysts were encouraged by Luminar's business pipeline and path to high-volume production.  A Citi analyst noted that "the Investor Day provided a number of encouraging updates across the technology/product roadmap (particularly around insurance, next-gen LiDAR and Luminar semiconductor), the new business pipeline, path to high volume production and LT financial targets."  Also, a Deutsche Bank analyst stated that Luminar investor day "mainly showcased [the Company's] strong commercial

and cost traction, and shared updated mid-to long-term targets which still
track closely with its original forecasts at the time of de-SPAC."  Additionally,
a Craig-Hallum analyst stated that "LAZR's Investor Day . . . . clarif[ied] its
medium and long-term outlook/financial structure, and showed the strength
of its existing wins with Volvo/Mercedes/SAIC/Polestar."

## VI.    CLASS PERIOD FALSE AND MISLEADING STATEMENTS

90.    The Class Period begins on February 28, 2023, at the above-
described first-ever Luminar Investor Day.  The conference was held at
Luminar's headquarters and was made available *through* a live webcast on
Luminar's website and as a recorded webcast on *YouTube,* which had nearly
750,000 views.

91.    During the conference, McAuliffe presented a series of slides
discussing Luminar Semiconductor's role in advancing Luminar's position in
the photonics and LiDAR markets.  The slides were also available in investor
presentation materials on Luminar's website.

92.    While discussing the common needs of Luminar Semiconductor's
business, McAuliffe touted Luminar Semiconductor's unique ability to
minimize cost and complexity through its technology.  More specifically,
McAuliffe stated, in part:

> It's fundamental to our strategy to understand that th[ese] common
> needs can drive common platforms, we only focus on the hardest
> Photon processing problems generation detection and processing . . . .

35

We solved 1550.  There is a general perception that 1550 is an expensive, traditionally, an expensive process and it's maybe a drawback.[6]  That is not the case.  We have solved that problem through, number one: architecture, as Jason described.  Number two: advanced packaging.  And number three: we can drive the economies of ***scale*** and the economics associated with that by leveraging both Luminar volume and volume to the wider market.

So, we're shifting gears. ***We're shifting gears to take what has been a sub-scale industry, sub-scale ecosystem, and industrializing that at scale.  And we need to do that, we need to do that both for the economics and for size, weight, and cost, in order to deliver lidars at millions of units.***

And as an example, the other key advantage of ***siliconization*** is this: people think that maybe the biggest advantage is you control your own supply chain, that's true.  You can control the quality, that's true.  You can control the performance, that's true.  But the biggest advantage of ***siliconization*** in general, is you can take a lot of complexity and cost out of the product.  Complexity in cabling.  Complexity in optics.  Complexity in electromechanical.  So anything you can put in ***silicon***, you can put in ***silicon***.

And I think we can see from other industry leaders like big fruit companies, that owning that stack, and internalizing, and ***siliconizing*** anything that you can, delivers elegant architecture, breakthrough performance, and breakthrough economics.

93.    The slide presented while McAuliffe was speaking was entitled

"Common Platforms that Drive Scale" and appeared as follows:

---

[6]    "1550" refers to the development of laser technology that uses the longer wavelength of 1550 nanometers, as opposed to the traditional wavelength of 905 nanometers.  The use of the higher-power laser with 1550 nm allows for measurements with higher fidelity, at longer distances, and with more accurate results than any other wavelength option.



94.    Defendants had posted on the internet the fraudulent slide

showcasing a chip that Luminar had not developed, and it was available for

download throughout the Class Period.

95.    The slide featuring the pilfered PIC in ¶ 93 above was materially

false and misleading when made for two reasons.  First, the statements

omitted the fact that the PIC featured did not belong to Luminar, and that in

reality, Luminar did not have a PIC at all, but only a chip far less

sophisticated in design and function than that pictured.  As opposed to the

Lidwave chip, ***the Luminar chip was neither  readily scalable nor***

***siliconized, which was inconsistent with the narrations from***

***McAuliffe.***  Their narrations were clearly intended for the Lidwave chip, to

which Luminar had no rights, but wanted to give the misleading impression

that they did.  Second, Luminar failed to disclose that it relied on a false

37

image of its core technology. That would have been obviously erroneous to
McAuliffe who would have been tracking developments in this core operation
of the company. Third, Luminar failed to disclose that if the truth were to be
revealed, as it was, that revelation would impugn the company's credibility
and subject it to the risk of legal and/or regulatory action. All of this
undisclosed information would foreseeably cause harm to investors and a
drop in stock price if and when it was revealed.

96.    In reality, ***the chip developed and manufactured by
Luminar Semiconductor was obviously far less sophisticated in
design and function with respect to the key areas McAuliffe was
touting to the market: siliconization and scalability.*** By picturing
Lidwave's PIC without properly attributing the product to Lidwave, and
withholding the image of their own chip, Defendants appeared to want to
cover up the appearance that their chip was less siliconized and less scaleable
and potentially other Luminar products were less scalable than they had
been represented to be. Things were not as they seemed and Luminar
intentionally misrepresented those things.

## VII.   THE TRUTH ABOUT LUMINAR'S "CHIP" IS DISCLOSED

97.    On March 17, 2023, half an hour before the markets closed,
*Forbes* published an article entitled "Lidar Maker Luminar Accused Of Using
Image Of Rival's Chip In Investor Conference." The *Forbes* Article disclosed

that Lidwave had accused Luminar of passing off Lidwave's next-generation

PIC design as Luminar's own technology after featuring a picture of

Lidwave's PIC in Luminar's slide deck presented during Luminar Investor

Day and linked on the Company's website.  Lidwave also threatened Luminar

with legal action.  More specifically, the *Forbes* Article stated, in part:

> Luminar . . . is accused of passing off a next-generation chip design
> created by a rival as its own technology after showing an image of the
> processor at a recent investor conference and in materials on its
> website.  Lidwave, the Israeli startup making the claim, says it plans
> to take legal action over the matter.

> The image, identified as a [PIC] by Luminar in its February 28
> conference and webcast with no reference to Lidwave, looks identical to
> a chip on Lidwave's website that is its core technology. The Jerusalem-
> based company sent a cease-and-desist letter to Luminar on March 14
> asking it to remove the image. It also notified the [SEC] of Luminar's
> "misuse of its product image to falsely promote its abilities and
> securities to investors."

*   *   *

> "***Integrated photonics allows lidar to become as scalable and
> profitable as anybody has imagined. . . . But surprisingly, the
> picture Luminar presented of a [PIC] as their solution is not
> their solution, but basically the exact image of our lidar***,"
> Lidwave CEO Yehuda Vidal told *Forbes*. "We will continue with a
> lawsuit if needed because it's a very huge problem for us. Some of our
> customers are very confused about what we do versus what they do."

98.    The *Forbes* Article featured a picture of the offending slide deck

presented by McAuliffe at Luminar Investor Day.  The PIC at issue is the

image on the far right of the slide:

39



99.    The article then compared the picture of the presentation to an image of Lidwave's PIC featured on Lidwave's website, which appeared identical to the one featured in Luminar's slide deck:



100.    On Sunday, March 19, 2023, the *Forbes* Article was updated to add that after being contacted by Forbes, a Luminar spokesperson stated that: "We have removed and replaced that image with an image of a new Luminar Semiconductor photonics integrated circuit[.]"  The revised

presentation was pictured in the article and shows the replaced image of

Luminar's PIC on the far-right hand side of the slide:



101.   The only thing Luminar could substitute for the sleek PIC image

of the Lidwave chip is this image:



102.   Notably, this chip is not a silicon PIC, and is from a publicly

available Freedom Photonics brochure from 2019—*years* before Luminar

Investor Day.

103.   That same day, Lidwave's CEO gave an interview to Time News,

an Israeli publication, and stated that clients and investors paid attention to

the Investor Day presentation, and came to him "very confused by the

situation and thought that we might be buying from Luminar, maybe copying

from them. This caused some confusion."

104.   The market was shocked by these revelations.  While Luminar

stock dropped following the publication of the initial Forbes article on March

17, 2023, the updated Forbes article featuring the actual state of Luminar's

PIC led to further drops as the news was picked up by additional outlets on

Monday.

105.   Shortly after market open on March 20, 2023,

TheFlyontheWall.com published an article titled, "LAZR: Luminar accused of

passing off next-gen chip design of rival as own, Forbes says," linking to the

updated Forbes article featuring Luminar's *actual* PIC.

106.   Later that day, SeekingAlpha published another article

commenting on the situation, noting that "[s]hares of Luminar Technologies

(LAXR) fell 7.90% on Monday in a deeper drop than LiDar peers."

107.   All told, following publication of the *Forbes* Article on Friday

exposing this intentional chicanery to investors, ***Luminar's stock price fell***

***9.09% over two consecutive trading days to close at $7.80 per share on***

***March 20, 2023.***

## VIII. EXPERT ANALYSIS CONFIRMS THAT LUMINAR'S CHIP DID NOT HAVE THE SAME CAPABILITIES AS THAT PICTURED DURING INVESTOR DAY

108.   To explain the differences between the image of Lidwave's chip

compared to the image of the chip Luminar replaced it with, Plaintiff

retained Dr. Lebby, an expert with specific expertise in photonic integrated

circuits.   All of Dr. Lebby's statements and conclusions are adopted as

allegations of this complaint.

### A.      Dr. Lebby's Qualifications And Experience

109.   Dr. Lebby is an engineer with a Ph.D. in Electrical and Electronic

Engineering and has worked extensively with PICs, photonic components,

their design, fabrication, testing, characterization, reliability and

manufacturing.   Lebby Report ¶ 4.   Overall, Dr. Lebby has approximately 40

years working in the industry to develop innovative PIC based products

where he has taken them from research to manufacturing.   *Id.*   He has been

awarded international industry recognition for his work with PIC

technologies.   *Id.*   Dr. Lebby is the current chairman of the International PIC

43

Conference, and has been for the past 8 years, which takes place in Brussels, Belgium annually. *Id.*

110.    Dr. Lebby received a Bachelor of Engineering degree in Electrical and Electronic Engineering in 1984 from the University of Bradford, UK. *Id.* at ¶ 4. He also received a Ph.D. in Electrical and Electronic Engineering in 1987 from the University of Bradford, UK and a Doctor of Engineering degree in electrical and electronic engineering in 2004 from the University of Bradford, UK. *Id.*

111.    He is currently Chief Executive Officer (CEO) and Chief Technology Officer (CTO) of GenusTechnik Inc., the consulting company through which he engages in his expert witness work. *Id.* at ¶ 7.

112.    Over the course of his 40-year career in electronics and photonics, Dr, Lebby has worked in nearly every aspect of the photonics and PIC business, ranging from wafers to components, to modules, connectors and cable technology as well as tunable InP laser diodes. *Id.* at ¶ 12. At the wafer level, he has experience in epitaxial wafer growth (compound semiconductors), electrical and optoelectronic device and circuit design, using modeling and simulation, electrical and optoelectronic device and component fabrication, testing, and qualification, to the implementation of devices into packages, connectors, and panels, both hermetic and non-hermetic, as well as analysis of package/panel materials such as plastics (including plastic

44

housings such as resin-packaged lead frame housings), optical plastics, metallic-based packages, semiconductor-based packages, and ceramic-based packages for the telecommunications and data-communications industries. *Id.* He has also designed device packages (through-pin, surface mount, flip-chip, and various combinations thereof) for printed circuit board mounting as well as electrical and optical connectors for various industrial and environmental applications. *Id.* Many of the designed package and connectors were implemented into telecommunications and data-communications applications both as manufactured products as well as testing, characterization and analysis of qualified product for volume scaling. *Id.* The modules/panels have been designed to work at RF frequencies that include copper wire, twisted wire pair and at fiber-optics. *Id.* Dr. Lebby has also worked in commercially based industrial research-and-development laboratories to bring new high-performance RF based electrical, electronic, optoelectronic- and photonic-PIC based technologies from the research proof-of-concept phase through prototyping and qualified manufacturing for volume release. *Id.* This has included both transfer as well as injection molding techniques for packaging and cabling connector designs. *Id.*

113.    Dr. Lebby also serves as a Technical Expert/Consultant for the European Commission. *Id.* at ¶ 26.  In his work at the European Commission, he reviews and advises on general photonics, silicon photonics

45

PICs, telecommunications, data-communications, cable interconnects,
connectors, semiconductors, photonics, optoelectronics, imaging, sensing,
display (LCD, LED, OLED etc.), tunable lasers, and related ICT (Information
and communications technology) technology. *Id.*

### B.    Dr. Lebby's Analysis

114.    Dr. Lebby reviewed the "Common Platforms Drive Scale" slide,
the image of Lidwave's PIC presented at Investor Day, and the image of
Luminar's chip that replaced Lidwave's. *Id.* at ¶ 29.

115.    With respect to the "Common Platforms Drive Scale" slide, Dr.
Lebby observed that Luminar is claiming that their technology platform
drives scale in the photonics industry through industrialization and more
importantly, miniaturization. *Id.* at ¶ 30.

116.    Dr. Lebby explains that miniaturization is typically accomplished
in the semiconductor world through integration of discrete components. *Id.*
In the silicon integrated circuit ("IC") industry, miniaturization has been
accomplished through integration of millions of discrete transistors onto
silicon chips. *Id.* In the photonics industry where photonics components are
typically much larger than silicon transistors, miniaturization is
accomplished with PICs, the integration of discrete photonic components onto
a single semiconductor chip. *Id.* Silicon photonics PIC chips benefit from the
use of silicon foundries, which allows costs to scale with volume, benefiting

from other silicon semiconductor products such as ICs that are run in the
foundries.  *Id.*

117.   Another material for PICs is Indium Phosphide (InP).  *Id.*  This
material is on smaller wafer sizes and does not benefit from the existing
infrastructure of silicon foundries that silicon does and does not reach similar
lower cost structures with volume scaling.  *Id.*  In general, popular
commercial examples of PICs include silicon photonics, InP based PICs,
Gallium Arsenide (GaAs) based PICs, and each can be found in commercial
products today.  *Id.*

118.   While there are many market applications for PICs that include
automotive (with LIDAR), the majority of commercial PICs designed today
are found in telecommunications, data-center based data-communications for
fiber optic based optical interconnects.  *Id.*  These interconnects can range
from a few meters to 100s of kilometers depending on the fiber optic link
design and are found both inside datacenters as well as in the optical
network and associated centers that provide networking technology for the
internet.  *Id.*

119.   Dr. Lebby also explains that the image below (Figure 2) shows an
electronic ASIC chip that is connected via 16 parallel fiber optic cables to an
optics chip.  *Id.* at ¶ 31.  The optics chip represents a silicon photonics PIC
chip.  *Id.*



120.   The image conveys a typical 16 channel optical interconnect that is popular in data center applications to connect switches and routers as part of data center optical networking architecture.  *Id.*  The optics chip would need to have the capability of being able to receive 16 optical channels, or more specifically 16 fiber optic cables and be able to connect those fiber optic cables in a way that the optical signals from those fiber optic cables are injected into the optical chip for optical processing.  *Id.*  The optical chip on the left-hand side of the image depicts several photonic components that make up the silicon photonics PIC chip design.  *Id.*  It can be seen that the circuitry is advanced with generic designs of photonics components along with optical waveguides.  *Id.*  These photonics components typically include optical waveguides, optical multipliers, and demultipliers, photodetectors, optical phase shifters, optical grating couplers, optical modulators, optical waveguide bends for optical signal processing, and discrete passive components for improving signal integrity all fabricated onto a silicon chip.

*Id.* This is a classic silicon photonics PIC chip known by persons of skill in
the art in the photonics industry. *Id.*

121.  The optical chip is an advanced design, showing the potential of
silicon photonics to be able to handle 16 optical signals, and be able to process
those signals that are sourced from an ASIC chip. *Id.* at ¶ 32. While the
image resolution is not at the level where each photonic component can be
accurately assessed, the optics chip from Lidwave does convey that silicon
photonics is capable of handling and processing 16 parallel optical signals
from ASIC chips using standard optical processing photonic components. *Id.*

122.  By contrast, Luminar's actual chip (Figure 3 below) has 28
electrical wire bonds and very much looks like a tunable laser chip fabricated
on an InP wafer. *Id.* at ¶ 33.



123.   This chip contains no evidence of being silicon and no evidence of
having 16 parallel optical channels. *Id.* At the front end of the SEM[7] image
what looks to be a single optical waveguide can be seen (physical inspection
will verify this observation). *Id.* This is where the tunable laser light would
emerge. *Id.* As the chip is designed in InP, it is assumed to operate at
1550nm wavelength. *Id.* The electrical wire bonds are be used to apply
electrical signals to the laser diode that is designed on the chip and allows
control and tuning of the optical wavelength close to and around the 1550nm
mark. *Id.* This chip may include other optical functions, but it resembles
the tunable laser chip that was designed by Oclaro[8] in the 2010-2020 time
frame. *Id.* Dr. Lebby was not been able to find the exact SEM on the
internet, however, he has found one of Oclaro's engineers who participated in
the InP tunable laser chip development in this time frame (Dr. Mike Wale)[9]
as indicated in Figures 4 and 5 below. *Id.*

124.   Figure 4 shows 2 slides from Dr. Mike Wale's technical
presentation on Oclaro InP technology. *Id.* at § VII(4). The ILMZ chip in the
top left-hand image contains an InP tunable laser that looks remarkably

---

[7]    SEM refers to "scanning electron microscopy."
[8]    Oclaro was a company acquired by Lumentum Inc
[9]    Dr. Mike Wale was part of the Oclaro InP PIC and laser design team.

similar to that displayed by Luminar. *Id.* While Dr. Lebby would need a
physical inspection to confirm, however, this is clearly not a silicon photonics
PIC chip. *Id.* at ¶ 33.



125.   Figure 5 shows showing 2 slides from Dr. Mike Wale's technical
presentation on Oclaro InP technology. *Id.* at § VII(5). The InP chip design
looks remarkably similar to that displayed by Luminar (*id.*):



126.   There is no evidence in Luminar's chip that this InP chip is a silicon photonics chip.  *Id.* at ¶ 33.  An InP tunable laser chip is definitely not a silicon photonics PIC chip at all, and there is no visible evidence that this chip is capable of handling 16 channels of light that would be received from an ASIC chip.  *Id.*

127.   The SEM chip that is shown in Figure 3 clearly is not an advanced silicon photonics PIC chip that has been conveyed to investors as depicted in Figure 2.  *Id.*

128.   Based on his analysis of the Lidwave PIC and Luminar's replacement chip, Dr. Lebby concludes that, in his opinion, the image of the PIC chip design by Lidwave that Luminar used in its Investor Day presentation demonstrates a high degree of sophistication and integration that could greatly lower the cost of manufacturing and performance of the Lidwave device.  *Id.* at ¶ 36.  He believes that knowledgeable investors attending Luminar Investor Day would have recognized this feature and have been led to believe that Luminar was indeed succeeding in developing cutting edge PIC chips.  *Id.*  In stark contrast, the image of the chip that Luminar claimed to be its own appears to be not silicon photonics at all, but an InP tunable laser chip.  *Id.*  Also, it is not clear why Luminar would show an InP laser chip when conveying a solution in silicon photonics to its investor base. *Id.*  InP is not as scalable in cost compared to silicon photonics

which benefits from the existing silicon foundry infrastructure with larger

format silicon wafers that is available globally. *Id.*

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    *Respondeat Superior* and Agency Principles Apply

129.    Luminar is liable for the acts of McAuliffe and other Company

officers, directors, employees, and agents, under the doctrine of *respondeat*

*superior* and common law principles of agency as all of the wrongful acts

complained of herein were carried out within the scope of their employment

or agency with the authority or apparent authority to do so.  The scienter of

McAuliffe and other Company officers, directors, employees, and agents is

similarly imputed to Luminar under *respondeat superior* and agency

principles.

### B.    McAuliffe Knew Or Was Reckless In Not Knowing That The PIC Pictured In The PowerPoint Presentation Was Manufactured By Lidwave

130.    McAuliffe had possession of or access to information indicating

the plain fact that the PIC photograph used during the Luminar Investor

Day presentation was misappropriated from Lidwave.

131.    First, as CW 1 explains above (*see* §V, *supra*), McAuliffe and the

rest of the executive team were involved in putting the presentation together,

and McAuliffe received materials for the presentation that were submitted by

the companies that made up Luminar Semiconductor.  On information and

belief, one of these companies that contributed materials was Freedom

Photonics.   McAuliffe had access to and permission to edit the presentation.

132.   Second, two of the images on the slide containing the

misappropriated photo (Chip die level and OptoElectronic Engines) appear to

have come from a 2019 document created by Luminar Semiconductor's own

Freedom Photonics:

Luminar's Slide:



Freedom Photonics Document:



133.   This same Freedom Photonics document featured the chip that Luminar used to replace the picture of Lidwave's PIC:



134.   Notably, that page of the Freedom Photonics document is titled "4-channel Tunable WDM Transmitter," which corroborates Dr. Lebby's conclusion that Luminar's chip was a tunable InP chip, ***not a silicon PIC as inaccurately captioned in the slide***.

135.   Considering that (1) Freedom Photonics was one of the three companies who made up Luminar Semiconductor, and CW 1 stated that those three companies were the main contributors to McAuliffe for presentation materials, and (2) the other images were sourced from that Freedom Photonics document, it is highly likely that Freedom Photonics

submitted this image to McAuliffe as part of the presentation. Thus, it is highly likely that McAuliffe had access to the correct photo.

136. Third, as the CEO of Luminar Semiconductor who was responsible for the day-to-day operations of the subsidiary, it was McAuliffe's responsibility to be familiar with the technology the subsidiary was making. Thus, he would have known that the PIC featured in the slide did not belong to Luminar, especially considering the difference between the Lidwave PIC and the Luminar replacement chip was so extreme.

137. Fourth, during the presentation, McAuliffe spoke extensively about Luminar's semiconductor technology, evincing his familiarity with the chips. In addition to the statements in ¶¶ 19, 68, 69, 71, 100 above, when discussing Luminar Semiconductor's devices, McAuliffe explained that:

> We build **chip-scale** components and **chip-scale** optoelectronic engines to solve really impactful problems for the world. . . .
>
> We have our own stack too. And our stack goes from, what we call, photons to decisions. And in some ways, it represents the signal processing flow, from the generation of photons with the lasers from Freedom Photonics, the detection of photons at Optogration, and the processing of those photons from Black Forest Engineering. We then combine that with advanced packaging, up to, then on to the next stage of DSP processing, and AI processing as described by the team earlier on. And largely, that feeds the signal for lidar, lidar software, perception, and mapping as described earlier on. . . .
>
> our platform is also very unique. . . . I won't go into the acronyms and some of the pretty dangerous materials, but these are pretty special materials. They're special for generating photons at different wavelengths and for detecting photons at different wavelengths. So we have a unique set of platforms and capabilities, right down to the

atomic level, that we can control, design, and optimize semiconductor
platforms for this full stack of technologies. . . .

138. Finally, Luminar's later claim that the photo of Lidwave's
photonic integrated circuit was not intended to "improperly pass off their tech
as ours" and was just a "generic graphic of a photonic integrated circuit"
makes little sense. It is nonsense that a company that produces a PIC would
put a photo of a generic device as the last image in a series of images
(separated by arrows) leading up to the Company's banner product. The
reason for the deception is clear. Luminar had no product or image (and
possibly no product at all) to match its words, so it had to steal an image from
a company that did. Indeed, in a competitive scramble for investor capital, it
is plausible that Luminar got the idea of raising capital by copying Lidwave's
pitch, even though Luminar had little or no progress to show for its own
efforts at integration and design of PIC chips.

139. Moreover, an internet search for a generic graphic of a "photonic
integrated circuit" did not locate the picture of Lidwave's PIC. Plaintiff's
counsel conducted a Google search of "photonic integrated circuit" for the year
2023 and was unable to find any pictures of Lidwave's PIC using those search
terms.

140. Additionally, a Google search of Lidwave's PIC image conducted
by Plaintiff's counsel shows that, until the Forbes article breaking the story

came out on March 17, 2023, that photo was only available on Lidwave's

website.

141.    Additionally, Lidwave's PIC was not even described as such on its

website – it was referred to as "Finite Coherent Ranging architecture."

142.    Accordingly, it is clear that Lidwave's PIC was deliberately

sought out and placed in the slide as a fanciful representation of a dream that

Luminar was peddling to investors, not mistakenly included.

### C.    Luminar Did Not Correct Its Deception Until Forced To Do So By Its Competitor And It Was Deceitful In Doing That

143.    Lidwave's CEO described how Luminar ignored his request to

take down the offending image of his company's PIC chip and how he was

forced to go to the SEC and the media to apply pressure to Luminar.  His

story is reported in Times News:

> Vidal claims that Lidwave drafted and sent a letter to Luminar
> the next day, but it did not respond. On March 14, the company
> sent a cease-and-desist letter that demanded the company
> remove the image of its chip, and at the same time, sent a letter
> to the SEC, the US Securities and Exchange Commission,
> claiming that Luminar was allegedly misrepresenting its
> products to investors. Even to this, according to him, the giant
> did not respond. That's why Vidal decided to turn to the media,
> and only then did Luminar replace the problematic image. "After
> that (the broadcast), clients and investors came to me who were
> very confused by the situation and thought that we might be
> buying from Luminar, maybe copying from them. This caused
> some confusion." According to him, Luminar does not have the
> ability to produce a product like his, and it is the only company in

the world that has succeeded in inventing a physical method that
enables the integration at the chip level.

**And what are your next steps?**
Vidal: "First of all, it's a copyright violation. ***It's also unfair
competition. They're trying to present potential customers
and investors with incorrect things to promote their
product, and of course there's a misrepresentation here to
investors and customers.*** It's a huge problem. All of this is
riding on us. We are waiting for a response from them, and if
there is no response, we will continue to take steps and get our
remedy from a court."

(emphasis added)

144.   As explained above, there is zero chance that Luminar's excuse
that it simply wanted to show a generic chip for this very specialized image is
truthful.  Such an attempt to cover up is evidence of scienter.

145.   Furthermore, the fact that Luminar removed the presentation
from the internet and replaced it with a presentation replacing Lidwave's
PIC with Luminar's chip—without so noting that the video and slide
presentation currently on its website or YouTube channel has been altered
from the original—is further evidence of scienter.

146.   Even further evidence of scienter is the fact that Luminar has
recently reposted the video of the Investor Day presentations, but still
without informing viewers that it has been altered from its original form and
without notice that the original image of the Lidwave PIC chip has been
replaced with a non-PIC chip.

147.   The newly revised version of the Investor Day presentations can be found here.  Luminar Day 2023.  Defendant McAuliffe's portion of the presentation begins at approximately the 1:40 time marker.



Luminar (Nasdaq: LAZR).

**D.    The PIC Was Luminar's Core Operation**

148.   Because the fraud alleged herein relates to the core business of Luminar – scaling down lidar for consumer and commercial vehicles with the critically important PIC at the center of that strategy – knowledge of the facts underlying the fraudulent scheme may be imputed to McAuliffe.

149.   With respect to its Iris lidar, Luminar notes that it "features our vertically integrated receiver, detector, and laser solutions developed by our Advanced Technologies & Services segment companies - **Freedom Photonics**, Black Forest Engineering, and Optogration.  **The internal**

60

**development of these key technologies gives us a significant advantage in the development of our product roadmap.**"  Freedom Photonics in particular is essential to Luminar developing its product roadmap because they manufacture photonic integrated circuits.  News outlets have reported that Freedom Photonics manufactures a wide range of photonic devices, including **photonic integrated circuits**, and have commented that photonic integrated circuits, in turn, are key to deploying LiDAR *en masse*, and that lidar has the potential to hugely affect the world by helping to prevent millions of automotive accidents.  Reporters also have reported that to fully realize this potential, however, **the technology must meet all the critical automotive performance and reliability requirements while being inexpensive enough to deploy *en masse***.  All-solid-state, FMCW lidar powered by OPAs and **photonic integration is key to making that happen**.

150.   In sum, PICs are essential to Luminar's mission of scaling down lidar for consumer and commercial vehicles.

151.   Luminar's CFO, Thomas Fennimore, explained the importance of Luminar Semiconductor to the broader company, stating, in relevant part:

> [Analyst]:  . . . You did announce the establishment of Luminar Semiconductor as its own brand and operation.  Can you talk to us about the product portfolio and how it helps Luminar as a whole?  And then what is the strategic rationale behind the platform?

61

[Fennimore]: . . . as we scale up to meet our automotive customers'
need, they need to scale up with them.  So bringing them in-house, we
believe reduces execution risk.

Number two, because we custom design these components for
ourselves, we wanted to bring that in-house and expand our
competitive moat. The third reason, and we didn't really realize this
until we brought them all in-house, put Luminar jerseys on . . . and
had them kind of sit around the product development table together is
that there's real technology synergies. As we're kind of designing our
next-generation LiDARs, having the laser, the ASIC and the chip guys
sit in the same room and talking about how you get the most
performance you can out of the LiDAR and particularly the
components.

Having them all work together, understand each other, better work
toward the common goal, we're seeing a technology benefits that is
going to manifest itself in our next-generation technology. And so,
we've got all under the house. I would say this is the core components
of our transceiver, which Fabrinet makes for us. And there are
potential opportunities to grow that business over time outside of the
LiDAR space because their technology is that good.

152.   Therefore, McAuliffe was in such a position at the Company to

access all material, non-public information concerning the Company's newly

formed subsidiary, Luminar Semiconductor, whose mission was to "[e]nable[]

Luminar to fulfill its mission." Given the importance of Luminar

Semiconductor and the chip-level up strategy to the Company, McAuliffe

would have been aware of whether the photograph used in the slide depicting

the PIC was the property of Luminar or was misappropriated from a

competitor, *i.e.* Lidwave.

## X.    LOSS CAUSATION

153.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial damages.

154.    During the Class Period, Plaintiff and other Class members purchased Luminar common stock at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Luminar common stock declined significantly causing Plaintiff and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

155.    Defendants made false and misleading statements and material omissions regarding Luminar's PIC device.  On the strength of these false and misleading statements and material omissions, the price of the Company's common stock was artificially inflated to a Class Period high of $9.89 on March 3 and March 6, 2023.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's common stock served to maintain the share price at artificially inflated levels by maintaining and supporting a false perception of

Luminar's business, operations, performance, and prospects.  When these
statements were corrected and/or the risks concealed by them materialized,
investors suffered losses as the price of Luminar common stock declined.

156.   The true facts and risks regarding Luminar's PIC device which
were omitted and/or misrepresented by Defendants eventually caused the
price of Luminar's common stock to decline, thereby causing harm to
investors.

157.   Defendants' statements were partially corrected, and the risks
concealed by the undisclosed facts regarding Luminar's PIC device
materialized, on March 17, 2023, when Forbes announced that Luminar had
misappropriated an image of Lidwave's PIC in its Luminar Investor Day
slideshow presentation.  Then, on Sunday March 19, 2023, Forbes updated the
article, exposing for the first time Luminar's actual chip.

158.   Shortly after market open on March 20, 2023,
TheFlyontheWall.com published an article titled, "LAZR: Luminar accused of
passing off next-gen chip design of rival as own, Forbes says," linking to the
updated Forbes article that contained Luminar's chip.

159.   Later that day, SeekingAlpha published another article
commenting on the situation, noting that "[s]hares of Luminar Technologies
(LAXR) fell 7.90% on Monday in a deeper drop than LiDar peers."

64

160.   These revelations caused investors to suffer losses because the price of Luminar's common stock plunged $0.78 per share, or 9.09%, over two consecutive trading days, to close at $7.80 per share on March 20, 2023.

161.   Accordingly, as a result of his purchases of Luminar's publicly traded common stock during the Class Period, Plaintiff and other members of the Class suffered economic losses and damages.

## XI.   CONTROL PERSON LIABILITY

162.   McAuliffe is liable as a direct participant with respect to the wrongs complained of herein.  In addition, McAuliffe, by reason of his status as a senior executive officer was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of his positions of control, McAuliffe was able to and did, directly or indirectly, control the conduct of Luminar's business.

163.   Specifically, because of his position within the Company, McAuliffe possessed the power and authority to control the contents of Luminar's statements and presentations to the market, including those containing the materially false and misleading statements and omissions of material fact alleged herein.  McAuliffe, by reason of his management, and the other facts adduced herein, had the ability and opportunity to review copies of the Company's statements and presentations alleged herein to be

misleading, prior to, or shortly after their issuance or to cause them to be corrected.

164.   By virtue of his position, McAuliffe had access to material non-public information.  McAuliffe knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

## XII.   APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

165.   The false and/or misleading statements alleged herein were material and public and at all relevant times the market for Luminar's common stock was an efficient market for the following reasons, among others:

a)   Luminar's common stock was listed on the NASDAQ Global Select Market, a highly efficient market;

b)   As a registered and regulated issuer of securities, Luminar filed periodic reports with the SEC, in addition to frequent voluntary dissemination of information;

c)   Luminar regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on national

circuits of major newswire services and through other wide-
ranging public disclosures such as communications with the
financial press and other similar reporting services;

d)    The market reacted to public information disseminated by
Luminar; and

e)    At least 8 analysts followed Luminar's business and wrote
reports which were publicly available and affected the
marketplace.

166.   As a result of the above, the market for Luminar's common stock
promptly digested current information with respect to the Company from all
publicly available sources and reflected such information in the securities'
market prices.  The historical trading prices and volumes of Luminar
common stock are incorporated herein by reference.

167.   The material misrepresentations and omissions alleged herein
would tend to induce a reasonable investor to overvalue Luminar's common
stock.  Without knowledge of the misrepresented or omitted facts, Plaintiff
and other members of the Class purchased Luminar common stock between
the time that Defendants made the material misrepresentations and
omissions and the time that the truth or concealed risk was revealed, during
which time the price of Luminar's common stock was artificially inflated by

Defendants' misrepresentations and omissions.  Thus, a presumption of

reliance applies.

## XIII.  AFFILIATED UTE PROVISION

168.   A Class-wide presumption of reliance is also appropriate in this

action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v.*

*United States*, 406 U.S. 128 (1972), because the Class's claims are, in large

part, grounded on Defendants' material misstatements and/or omissions.

Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business operations and financial

prospects – information the Defendants were obligated to disclose – positive

proof of reliance is not a prerequisite to recovery.  All that is necessary is that

the facts withheld be material in the sense that a reasonable investor might

have considered them important in making investment decisions.  Given the

importance of the Class Period material misstatements and omissions set

forth above, that requirement is satisfied here.

## XIV.  NO SAFE HARBOR

169.   The safe harbor provisions for the forward-looking statements

under the Private Securities Litigation Reform Act of 1995 are applicable

only under certain circumstances that do not apply to any of the materially

false and misleading statements and omissions alleged in this Complaint.

170.   First, the identified false and misleading statements and/or
omissions herein are not a forward-looking statement, but instead is a
statement of current or historic fact, or is actionable in context because it
omits then-existing material facts.

171.   Second, the identified false and misleading statements herein
were not identified as a forward-looking statements.

172.   Third, to the extent there were any forward-looking statements
that were identified as such at the time made, those statements also
contained statements of present or past facts and so are not entitled to
protection under the safe harbor.

173.   Fourth, to the extent there were any forward-looking statements
that were identified as such at the time made, there were no meaningfully
cautionary statements identifying important factors that could cause actual
results to differ materially from those in the purportedly forward-looking
statements.  Such statements were also not accompanied by cautionary
language that was meaningful because such warnings or "risk" factors
contained in, or incorporated by reference in, the relevant press release, SEC
filings, earnings call, or other public statements described herein were
general, "boilerplate" statements of risk that would affect any technology
company, and misleadingly contained no factual disclosure of any of the

specific details concerning Luminar's PIC device, or similar important factors
that would give investors adequate notice of such risks.

174.   Fifth, to the extent there were any forward-looking statements,
Defendants are liable for those false and misleading forward-looking
statements because at the time each of those forward-looking statements was
made, the particular speaker knew that the particular forward-looking
statements were false, or, by reason of what the speaker failed to note, was
materially false and/or misleading, and/or that each statement was
authorized and/or approved by a director and/or executive officer of Luminar
who actually knew that each such statement was false or misleading when
made.

## XV.   CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Defendants**

175.   Plaintiff re-alleges each allegation above as if fully set forth
herein.

176.   This claim is brought under Section 10(b) of the Exchange Act (15
U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17
C.F.R. § 240.10b-5), against Defendants.

177.   During the Class Period, Defendants violated Section 10(b) of the
Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false

and misleading statements specified herein concerning Luminar's PIC device,
whose truth they knowingly or recklessly disregarded when they failed to
disclose material facts necessary to make the statements made, in light of the
circumstances under which they were made, not false and misleading.

178.   During the Class Period, Defendants violated Section 10(b) of the
Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing
devices, schemes, and artifices to defraud and engaging in acts, practices, and
a course of conduct that operated as a fraud or deceit upon Plaintiff and other
members of the Class in that Defendants concealed that the photo of the PIC
on the slide from Luminar Investor Day depicted a Lidwave PIC, not a
Luminar PIC.

179.   Defendants, individually and in concert, directly and indirectly,
by the use, means or instrumentalities of interstate commerce and/or the
mails, engaged and participated in a continuous course of conduct to conceal
non-public, adverse material information about the Company's operations
and financial condition as reflected in the misrepresentations and omissions
set forth above.

180.   Defendants each had actual knowledge of the misrepresentations
and omissions of material facts set forth herein, or acted with reckless
disregard for the truth by failing to ascertain and to disclose such facts even
though such facts were available to them, or deliberately refrained from

71

taking steps necessary to discover whether the material facts were false or misleading.

181. As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class Members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

182. Luminar is liable for the acts of McAuliffe and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Luminar in taking the actions alleged herein.

183. Plaintiff and Class Members purchased Luminar common stock, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects. In so doing, Plaintiff and Class Members relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements. Plaintiff and Class Members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

184.   At the time of Defendants' false statements, misrepresentations and omissions, Plaintiff and Class Members were unaware of their falsity and believed them to be true.  Plaintiff and the Class would not otherwise have purchased Luminar common stock had they known the truth about the matters discussed above.

185.   Plaintiff is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claims, and within five years after the violations with respect to Plaintiff's investments.

186.   By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

187.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of Luminar common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against McAuliffe

188.   Plaintiff realleges each allegation above as if fully set forth herein.

189.   This Count is asserted against McAuliffe for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

190.   As set forth above, Luminar committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

191.   McAuliffe, by reason of his status as senior executive officer of Luminar, directly or indirectly controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act.  McAuliffe directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's and the Class's investments in Luminar common stock within the meaning of §20(a) of the Exchange Act.  Therefore, McAuliffe is jointly and severally liable for the Company's fraud, as alleged herein.

192.   McAuliffe controlled and had the authority to control the content of the Company's public statements.  Because of his close involvement in the every-day activities of the Company, and because of his wide-ranging supervisory authority, McAuliffe reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

193.   McAuliffe knew or recklessly disregarded the fact that Luminar's representation was materially false and misleading and/or omitted material facts when made.  In so doing, McAuliffe did not act in good faith.

74

194.   By virtue of his high-level position and his participation in and awareness of Luminar's operations and public statements, McAuliffe was able to and did influence and control Luminar's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

195.   McAuliffe had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

196.   As set forth above, Luminar committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

197.   As a direct and proximate result of McAuliffe's wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Luminar common stock.

## XVI.  CLASS ACTION ALLEGATIONS

198.   Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities other than Defendants that purchased or otherwise acquired Luminar common stock between February 28, 2023 and March 17, 2023,

75

inclusive, and were damaged thereby, seeking to pursue remedies under the Exchange Act.

199.    Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

200.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Luminar common stock was actively traded on the NASDAQ Global Select Market, which is an efficient market.  While the exact number of Class Members cannot be determined at this early stage, Plaintiff believes that thousands of people held Luminar common stock during the Class Period.  Record owners and other members of the Class may be identified from records maintained by Luminar or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

201.    Plaintiff's claims are typical of the claims of the other members of the Class.  All members of the Class were similarly affected by Defendants'

allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

202.   Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class.

203.   Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

   a)      Whether the federal securities laws were violated by Defendants' acts as alleged herein;

   b)      Whether statements made by Defendants during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

   c)      Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Luminar's common stock to be artificially inflated during the Class Period;

   d)      Whether Defendants acted with the requisite level of scienter with respect to the Exchange Act claims;

e)    Whether McAuliffe is a controlling person of Luminar;

f)    Whether reliance may be presumed pursuant to the

*Affiliated Ute* presumption, fraud-on-the-regulatory process, or fraud-on-the-

market doctrine for the Exchange Act Claims; and

g)    Whether the Class members have sustained damages, and

if so, the proper measure of damages.

204.   Plaintiff knows of no difficulty that will be encountered in the

management of this action that would preclude its maintenance as a class

action.

205.   A class action is superior to all other available methods for the

fair and efficient adjudication of this action because, among other things,

joinder of all members of the Class is impracticable.  In addition, since the

damages suffered by individual members of the Class may be relatively

small, the expense and burden of individual litigation would make it nearly

impossible for members of the Class to bring individual actions.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for

relief and judgment including:

A.    Determining that Counts I through II of this action are a proper

class action under Federal Rules of Civil Procedure 23, certifying Plaintiff as

Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.      Awarding rescissory damages in favor of Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

D.      Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

E.      Awarding Plaintiff and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

F.      Awarding such other and further relief as may be just and proper.

## XVIII.    JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  January 10, 2025                    Respectfully submitted,

79

By: */s/ James M. Wilson, Jr.*
James M. Wilson, Jr.


**FARUQI & FARUQI, LLP**
James M. Wilson, Jr. (admitted *pro hac vice*)
Robert W. Killorin admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com
         rkillorin@faruqilaw.com

*Lead Counsel for Lead Plaintiff*


**SCHLESINGER LAW OFFICES, P.A.**
Jonathan R. Gdanski (FL. Bar No. 32097)
Jeffrey L. Haberman (FL. Bar No. 98522)
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
Telephone: 954-467-8800
Email:
Jonathan@schlesingerlawoffices.com
JHaberman@schlesingerlawoffices.com

*Liaison Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2025, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

By: */s/ James M. Wilson, Jr.*
James M. Wilson, Jr.