IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| JOHN ALMS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LUMINAR TECHNOLOGIES, INC., and MIKE MCAULIFFE,<br><br>Defendants. | Case No.: 6:23-cv-982-JSS-LHP<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT** |

## INTRODUCTION

Lead Plaintiff John Alms ("Plaintiff") alleges that Defendants misled investors regarding the truth of Luminar's technological advances in the lidar industry by falsely passing off an image of another company's (Lidwave) silicon photonic integrated circuit ("PIC") as its own during its Investor Day conference ("Investor Day") on February 28, 2023.[1]  PICs are key to making lidar smaller and more cost efficient, and the companies who can move this technology forward will have a huge competitive advantage.  In its dismissal order ("Order," Dkt. 75), the Court explained that while "Luminar's use of

---

[1]    All "¶__" references are to the Third Amended Class Action Complaint ("TAC" or "Complaint"), Dkt. 78. Unless otherwise noted, all emphases are added, all citations and internal quotations are omitted, and capitalized terms have the same meaning as those used in the TAC.  "MTD" and "MTS" refer to Defendants' motion to dismiss (Dkt. 81) and motion to strike (Dkt. 82), respectively.

1

Lidwave's PIC chip in its presentation misled investors into believing the graphic depicted Luminar's PIC chip," it was immaterial because it "does not convey anything about the capabilities of Luminar's product[;]" that is, Plaintiff "fail[ed] to explain what sophistication or function the graphic conveyed that Luminar's chip lacks (or how it did so)."  Order 12-13.

Plaintiff has completely addressed this shortcoming in the TAC by detailing exactly what sophistication or function the graphic conveyed that Luminar's chip lacked and how its replacement was not an image of a PIC chip at all – even though Defendants continued to falsely identify it as one! Plaintiff consulted one of the most prominent experts in the photonics industry, Dr. Michael Lebby.  Dr. Lebby explained the types of chips displayed in the images at issue and what can be observed about their respective capabilities.  Plaintiff's new allegations, as well as Dr. Lebby's analysis, are properly considered at this stage of the litigation.[2]

Dr. Lebby explained that the original image (belonging to Lidwave) presented at Investor Day showed an electronic ASIC chip connected via 16 parallel fiber optic cables to a silicon optics PIC, which displays an advanced design that demonstrates a high degree of sophistication and integration that could greatly lower the cost of manufacturing and performance.  This image

---

[2]    *See* Plaintiff's Opposition to Defendants' MTS ("MTS Opp."), filed herewith.

dovetailed with McAuliffe's statements about scaling and siliconization while the image was displayed.  By contrast, the image Luminar replaced it with after the truth of the misappropriation was revealed was not consistent with McAuliffe's statements at all—in fact, it **was not even a PIC chip and appears to be the same "4-channel Tunable WDM Transmitter" chip that a Luminar subsidiary developed around 2019**.  Dr. Lebby corroborates these allegations by explaining that the replacement image is a non-silicon chip with 28 electrical wire bonds that appears to be a tunable laser chip fabricated on an Indium Phosphide ("InP") wafer.

Further, even after the deception was exposed in a Forbes article, Defendants remained dishonest and substituted an image of a non-PIC, WDM Transmitter chip, but did not change the original caption: Photonic Integrated Circuits.  This is additional evidence of culpable intent to deceive and the fact that Luminar had no PIC chip of its own to display!

The Court also found that Plaintiff did not sufficiently show that reasonable investors would have been misled by its use of the challenged image. Order 14.  The TAC remedies this by, *inter alia*, providing particularity about the market's reaction to the news.  The misappropriation of the chip image was revealed in a Forbes article on March 17, 2023, which caused the stock to drop that day.  The stock dropped even further on March 20, 2023, after other outlets picked up Forbes' updated article published the day prior

3

(Sunday, March 19) that, for the first time, contained a picture of Luminar's actual chip (the non-PIC InP chip).  Only "new" information can move the market, and the only new information was the publication of Luminar's actual non-PIC chip image.  The fact that the stock dropped on the release of Luminar's actual chip image, although the misappropriation itself had already been revealed to the market, strongly supports the fact that the revelation of the true state of Luminar's technology was material to investors.

The TAC also further particularized the point that the misappropriation was uncovered by Lidwave's "clients and investors" watching the Investor Day presentation.  The fact that *investors* recognized the advanced chip image and contacted Lidwave's CEO about it further supports materiality.

The Court also determined that Plaintiff's previous scienter allegations were insufficiently particularized.  Order 18-21.  To address this, Plaintiff added statements from CW 1, a former Senior Executive Assistant from October 2022 to September 2024, who participated in the Investor Day presentation through their role providing executive assistance to McAuliffe and others.  CW 1 explained, *inter alia*, the importance of the presentation to Luminar, which took about 6 months of preparation and *involved everyone in the executive staff*.  CW 1 explained that McAuliffe was involved in putting the presentation together, and had access to and permission to edit it.

Additionally, the TAC sets forth new facts that explain what specifically

4

the chip images conveyed about their respective sophistication and function with regards to the scalability needed to get ahead in the lidar field, and why this would have been readily apparent to McAuliffe, a person knowledgeable in the semiconductor field and Luminar Semiconductor's CEO.

Defendants continue to challenge materiality and scienter, but the TAC more than sufficiently pleads those elements.

## ARGUMENT

The court must presume all factual allegations of the complaint as true and draw "all plausible inferences" in Plaintiff's favor. *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, 2018 WL 4844019, at *4 (S.D. Fla. Oct. 4, 2018).

## I.    THE IMAGE WAS MATERIALLY FALSE AND MISLEADING

It is unlawful to (1) "make any untrue statement of a material fact" or (2) "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

### A.    The Lidwave PIC Materially Misled Investors

A misrepresented or omitted fact is material if there is a "substantial likelihood" that the information "would have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available" to investors. *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012). Defendants' use of Lidwave's PIC chip was material.

First, Investor Day was billed as an event for consumers, investors, customers, and suppliers, where Luminar would "unveil its long-term product and technology roadmap for existing and new [original equipment manufacturer] customers." ¶13. Analysts anticipated that Investor Day would "update investors on [Luminar's] progress towards scaling production . . . ." ¶84. Thus, McAuliffe's portion of the presentation was critical to investors because it pertained to this very issue of "scale," and it is well-known in the lidar industry that scaling production is dependent on PICs. ¶¶19, 59-60, 93.

The Court noted that McAuliffe did not specifically reference the PIC while speaking. Order 21. The TAC addresses this through allegations, fully supported by Dr. Lebby, that what was displayed during McAuliffe's presentation was a silicon-based PIC, which was necessarily what McAuliffe was talking about while discussing siliconization while that slide was displayed. ¶128. Indeed, McAuliffe's entire speech was aligned with the material on the slides. For example, while presenting the slide featuring Lidwave's PIC, titled "Common Platforms Drive Scale," ¶93, he stated, "common needs can drive common platforms. We only focus on the hardest photon processing problems . . . ." Dkt. 78-1 at 336. This language matches the language on the slide: "Common needs – Hardest photon generation, detection and processing problems." ¶93. He also talked about the Company "shifting gears," "industrializing that at scale," and the need to do that for

"economics and for size, weight and cost in order to deliver lidars at millions of units," ECF No. 78-1 at 336, which corresponds to the slide's language about those same topics ("[s]hift gears," "scale," "[i]ndustrialization," and "[m]iniaturization"). ¶93. He also discussed "siliconization" as delivering "elegant architectures, breakthrough performance, and breakthrough economics," ECF No. 78-1 at 336, which lines up with the arrows at the bottom of the slide pointing to the final image, "[p]hotonic [i]ntegrated [c]ircuits," which displays Lidwave's silicon-based PIC. ¶93. As Dr. Lebby noted, it would have made no sense to discuss silicon photonics while displaying the chip that Luminar eventually replaced it with, which was neither silicon nor a PIC! ¶128. *See In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. Dec. 2021) (stating "[c]ircumstance, setting, and even 'manner of presentation' all matter" to determine if "a false or misleading impression" was conveyed).

Defendants complain that Dr. Lebby's analysis cannot be given any weight because expert testimony "is only proper if it concerns matters beyond the understanding of the average lay person." MTD 15 (citing *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). However, that pertains to whether an expert's testimony is **admissible**, which is not at issue here. Plaintiff's allegations stand on their own. The fact that they are fully supported by a world-renowned expert is, of course, good, but not necessary. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D.

Cal. 2000) ("Even under the [PSLRA], plaintiffs are only required to plead facts, not to produce admissible evidence.").[3]

Furthermore, Dr. Lebby's description of Lidwave's and Luminar's respective chips is based on the same images that investors saw. While it is true that a "reasonable investor" is not a scientific expert, no scientific expertise is required to see that Lidwave's PIC appears much more sophisticated in function and design than Luminar's replacement non-PIC. Dr. Lebby merely provides the particularity the Court previously found was missing, explaining what is pictured and what those images communicate about the chip's respective function. His analysis is not "speculative." It is based on what the images show, and it is consistent with Lidwave's own description of its chip, ¶¶77, 119-21, 128, Freedom Photonics' own description of the replacement image in its 2019 brochure ("4-channel tunable WDM transmitter"), ¶¶133-34, and similar InP chips, ¶¶123-26. Dr. Lebby's analysis also confirms that the chip images can convey information about their respective sophistication and function without exposing trade secret architecture, which addresses the Court's concern on this front. *See* Order 14.

Additionally, "reasonable investors" are presumed to understand common knowledge important to the industries in which they invest. *See, e.g.,*

---

[3]    Defendants' authorities on the appropriateness of Dr. Lebby's report at MTD 12-14 are factually inapposite, as explained more fully in Plaintiffs' MTS Opp.

*Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016); *Jia Tian v. Peloton Interactive, Inc.*, 2025 WL 510043, at *11 (E.D.N.Y. Feb. 14, 2025).[4]  It is well-known in the lidar industry that scaling production is dependent on PICs, ¶¶59-60, and the function and sophistication of Luminar's PICs (or lack thereof) would therefore have been material information to a reasonable investor.  Given PIC chips' importance to scalability for Luminar's bottom line, it would have been apparent that the image shown on Investor Day advanced that goal while the starkly different replacement non-PIC image did not.

Second, that a reasonable investor would think the images are material is clearly shown by the fact that Lidwave's "clients and investors" spotted the pilfered, sophisticated PIC immediately and informed Lidwave's CEO.  ¶¶29, 103.  Defendants argue that this is "hearsay" and these individuals "presumably had some unique understanding of the" image.  MTD 16.  This argument does not support dismissal because "hearsay" is permitted at the pleading stage, even in PSLRA cases, *see McKesson*, 126 F. Supp. 2d at 1272, and there is no reason to believe that Lidwave investors are not reasonable investors.

Third, the fact that Luminar's stock fell again after Forbes updated its article to include the image of Luminar's non-PIC chip supports the fact that

---

[4]      *Alaska Electrical Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 347 (3d Cir. 2009) is inapposite, as it discusses when investors are on "inquiry notice" of fraud for statute of limitations purposes. MTD 15.

reasonable investors found the true state of Luminar's technology to be material.  Plaintiff bases his claim of reliance on the efficient market theory, ¶¶165-67, a "corollary" of which "is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price." *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013).  Defendants do not dispute that the stock dropped after the news of the misappropriation (without Luminar's updated image) came out on Friday, March 17, 2023 before market close.  ¶104.  The stock dropped again on March 20, 2023, after news outlets linked to the updated Forbes article published Sunday, March 19 (while the market was closed), containing, for the first time, the image of Luminar's actual chip.  ¶¶104-06.  Indeed, it was reported that Luminar "fell 7.90% Monday [March 20] in a deeper drop than [its] LiDar peers."  ¶106.  This suggests no general industry news was to blame, and Defendants point to no other information accounting for the drop.  *See In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1371 (N.D. Ga. 2005) ("allegations of the disclosure's effect on the . . . stock" "frequently indicate materiality"); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1183 (S.D. Cal. 2009) ("[t]he significance of this information is illustrated by . . . the market reaction to the alleged disclosures").

Fourth, the fact that the Lidwave image was necessarily deliberately

10

sought out, given how difficult it was to track down in the first place,[5] demonstrates that Luminar intended to communicate to the market something materially different about the status of Luminar's technology than any image it possessed could do.  Indeed, the only image Luminar could come up with as a replacement was a non-silicon, non-PIC InP chip.  *C.f. Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 432 (S.D.N.Y. 2015) ("[r]arely have I heard a sillier argument"—that the information was material to the company but not to "reasonable investors").

### B.    McAuliffe Was A "Maker" Of His Portion Of The Investor Day Presentation

Contrary to Defendants' arguments, the TAC ***does*** allege that McAuliffe is liable as the "maker" of the misleading image under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-44 (2011).  *See* ¶163.  *Janus* held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."  564 U.S. at 142.  To determine whether someone is a "maker" of a statement, "attribution within a statement ***or implicit from surrounding circumstances*** is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  *Id.*

---

[5]    *See* ¶¶139-42 (explaining that the image was available only on Lidwave's website, under a different name entirely, and could not be found by searching Google for a PIC).

11

at 142-143.  As the Supreme Court explained:

> [t]his rule might best be exemplified by the relationship between a speechwriter and a speaker.  Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 143.

McAuliffe is the speaker for the spoken, written, and pictorial parts of his speech, and there is nothing speculative about that fact in light of *Janus*. The slides in which the misleading image appeared were explicitly attributed to McAuliffe.  Not only did his name appear on the first slide in the set, *see* ECF No. 78-1 at 250, he presented them and made statements that corresponded with their text.  *See Section I.A., supra.*  To be clear, a misleading image is just as actionable under §10(b) as a spoken statement.  *See, e.g., Prairie Ventures, L.L.C. v. Liotta*, 2017 WL 11630279, at *4, *8 (N.D. Ga. Aug. 3, 2017) (photograph created materially misleading impression of product's status); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *9 (N.D. Cal. Apr. 28, 2020) (image on company's website was misleading).  Even if McAuliffe's slides were prepared entirely by someone else, he would ***still*** be considered their "maker" at the MTD stage, because he had "ultimate authority" over them: at any point in time he could have stopped speaking or noted that the image on the slide ***he was presenting*** was not actually a PIC belonging to Luminar, while the slides' preparer would be akin to the speechwriter.  *See Janus*, 564

12

U.S. at 143; *c.f., S.E.C. v. Norstra Energy Inc.*, 202 F. Supp. 3d 391, 395-97 (S.D.N.Y. 2016) (finding, at summary judgment, that defendant was the "maker" of alleged misstatements in promotional materials attributed to him, even though he claimed only a minor role in their creation, because that, "at most, create[s] a factual dispute to be resolved by a jury").

Defendants' authorities only serve to illustrate the point. In *In re Galectin Therapeutics, Inc. Securities Litigation*, 843 F.3d 1257, 1271-72 (11th Cir. 2016), the court found that the company could not be held liable as a "maker" of promotional statements about it published by third-party stock promoters (MTD 7, 10). *See also A&M Mgmt. Inc. v. Deme*, 2019 WL 7344795, at *3 (S.D. Fla. Mar. 14, 2019) (no explanation of how statements in documents from company defendant could be attributed to anyone but company defendant) (MTD 10). In *Jain v. Nexgen Memantine, Inc.*, 2021 WL 1578542, at *6 (M.D. Fla. Apr. 22, 2021), the complaint did not specify who, exactly, made the challenged statements, and the defendants' mere attendance at a call or meeting during which the statements were made was insufficient (MTD 10). Here, by contrast, the slide was not published by a third party, and was directly attributed to McAuliffe (and Luminar) by appearing on his portion of the presentation slides while he presented them and made statements that

13

corresponded with their content.[6]   At minimum, McAuliffe's status as a "maker" of the slide is "implicit from surrounding circumstances," *Janus*, 564 U.S. at 142-43, and Defendants' authorities are not to the contrary.

## II.    DEFENDANTS ACTED WITH SCIENTER

Defendants acted with scienter if they acted with an "intent to deceive, manipulate, or defraud, ***or severe recklessness***." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). Plaintiffs may show recklessness by pleading that "defendants possessed knowledge of facts or access to information contradicting their public statements, so as to prove that defendants knew or should have known that they were misrepresenting material facts related to the corporation." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1233 (N.D. Ga. 2019).  The Eleventh Circuit has stated, "a fifty-fifty chance" that defendants "knew about the alleged fraud or w[ere] severely reckless in not knowing" is sufficient.  *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *15 (M.D. Ga. Mar. 23, 2018).  No "smoking-gun" is required, and the inference of scienter need not be "even the most plausible of competing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The TAC sufficiently pleads why the risk of misleading investors would

---

[6]    Defendants also cite *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) in support of their argument regarding McAuliffe's status as a "maker," yet that case does not discuss that issue, and his status as a "maker" is neither "conclusory" nor "speculation," as explained herein.  MTD 8.

have been "so obvious," *In re Pegasus Wireless Corp. Sec. Litig.*, 657 F. Supp. 2d 1320, 1327 (S.D. Fla. 2009), and why the inference of scienter is at least as compelling as Defendants' "innocent" explanation.

### A.    Defendants Acted With Severe Recklessness

First, according to CW 1, McAuliffe *was* involved in creating the Luminar Day presentation.  *See* ¶¶52, 80-83.  This closes the gap that the Court identified in its previous order (noting absence of "allegations as to who is responsible for assembling the presentation").  Order 24.[7]  Defendants argue that CW 1's allegations are insufficiently particularized, but "the Eleventh Circuit does not take such a 'hard line' on confidential witnesses."  *City of Sunrise Gen. Empls.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *8 (N.D. Ga. May 15, 2018) (citing *Mizzaro*, 544 F.3d at 1239-40).  A complaint need only provide "in a cognizable and detailed way the basis of the [CW's] knowledge."  *Id.*  Plaintiff has done so here, explaining that CW 1 served as an executive assistant during the relevant time period for McAuliffe and another executive, and was involved in the Luminar Day presentation in that capacity.

---

[7]    *Mogensen v. Body Central Corp.*, 15 F. Supp. 3d 1191, 1219-20 (M.D. Fla. 2014) is not to the contrary, as CW 1 provides the requisite detail needed to explain the presentations' assembly by explaining who contributed materials to McAuliffe's part of the presentation, at which stage in the process McAuliffe got involved, and his ability to review and edit it (MTD 8-9).  *See* ¶¶82-83.  And unlike the CWs in *Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc.*, 2010 WL 11505856, at *5 (S.D. Fla. Jan. 15, 2010), CW 1 *does* describe how they came to know the information in the complaint—they were McAuliffe's executive assistant and involved in the presentation at issue (MTD 9).  *See* ¶52.

15

¶52.[8] CW 1 also gave specific details about how presentations like the one for Luminar Day were assembled and who was involved. The fact that Luminar used the same process for other presentations does not somehow undermine CW 1's account. *See Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *4 (N.D. Ill. Oct. 30, 2012) (crediting allegations of CWs who identified company's "common practice" and finding that they buttressed plaintiff's falsity allegations). Specifically, CW 1 would contact the direct contributors to McAuliffe for the presentation, which included personnel from Freedom Photonics and the other companies that made up Luminar Semiconductor. ¶83. CW 1 would create a folder and a document accessible to those working on the presentation, and would inform McAuliffe, his direct reports, and certain others when the presentation was ready for editing. *Id.* McAuliffe had access to the folder and permission to edit the presentation. ¶131. Plus, he needed to review it beforehand, as his speech tracks the slides. ¶¶83, 131.

CW 1 also provides additional facts supporting the importance of Investor Day to the Company, stating that it was a "big deal" such that preparations for it began probably about six months prior to the event. ¶80.

---

[8] Defendants dispute CW 1's involvement in the presentation because they say CW 1's participation "through [their] role providing executive assistance" somehow means that CW 1 was not, in fact, involved. MTD 6. This makes little sense, and improperly disputes the facts in any event. *See In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *5 (N.D. Ga. Jan. 29, 2009) ("[D]eterminations of facts and factual disputes have no place in a motion to dismiss.").

*See also* ¶¶13, 79, 84 (further details about event's importance).

Second, the TAC's explanation of the specific technological function that the respective chip images conveyed further supports McAuliffe's scienter. Specifically, the Lidwave image featured a silicon PIC and the only image Luminar had to replace it with was a different, less sophisticated type of chip from 2019 that was neither silicon nor a PIC. ¶¶119-27. It strains credulity that McAuliffe (as the CEO of Luminar Semiconductor tasked with developing PICs to solve the crucial scalability problem) would not have known the difference between a silicon-PIC (belonging to a direct competitor) and the non-PIC, InP chip Luminar actually possessed. ¶¶148-52; *see Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1302 (N.D. Ga. 2021) ("core operation" can "bolster[ ]" scienter allegations). Furthermore, it is highly unlikely that he would not have realized what that PIC image would convey to the market about Luminar's technology while he spoke about siliconization, photonics, and scaling while displaying an image of a silicon PIC. Indeed, the status of this key piece of technology was "squarely within his bailiwick." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *12 (C.D. Cal. Aug. 4, 2014).[9] Indeed, the fact that Defendants continued to identify Luminar's actual non-

---

[9]    Defendants' authorities are inapposite. *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1324-25 (M.D. Fla. 2002) (no allegations beyond their titles supported the executives' knowledge of GAAP violations, and the alleged scheme predated them); *Mich. Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, 2019 WL 1429667, at *29 (M.D. Fla. Mar. 29, 2019) (involving projections that turned out to be wrong) (MTD 20-21).

17

PIC InP chip as a photonics PIC chip in the same slide after the misappropriation was revealed in the *Forbes* article – despite a prior run-in with the SEC about publicly overstating its technological capabilities and commercial readiness – further supports scienter. ¶¶4, 25.

Even if a lower-level employee put that image in the deck, rather than McAuliffe himself, McAuliffe had the opportunity to review and edit the slides in advance, *see* ¶¶81-83, and he surely would have reviewed it.  After all, he was only responsible for 9 slides (7 if you exclude the title slide and the last one that only says "Luminar") in a presentation that was critical to raising capital for the company, *see* 78-1 at 250-59, and he needed to know what was in them in order to prepare and deliver his oral statements, which corresponded with the text on the slides.  *See* §I.A, *supra.*

It would have been severely reckless of him to not do so prior to giving the presentation, particularly considering that the presentation was also the market's introduction to the new subsidiary of which he served as CEO.  *See Constr. Indus. & Laborers Jt. Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9 (1st Cir. 2021) (finding it was at least "highly reckless" to promote a product without first checking it worked); *see also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 237–38 (E.D. Pa. 2021) (rejecting a defense of "a mere copy and paste" error and finding scienter where defendants attended the presentation and "tolerated the misrepresentation.").

18

## B.    Defendants Had Motive

It is well-established that "the absence of a motive allegation is not fatal," and that insider trading has never been required to plead scienter.  *Tellabs*, 551 U.S. at 325.[10]  That said, Defendants ***did*** have motive to pass off Lidwave's PIC as Luminar's own.  The SEC had requested clarity from Luminar in December 2022, two months before Investor Day, about the true status of its technology, and Luminar was forced to admit that as of the end of 2021, it "neither achieved technological feasibility of its developed software nor achieved a level of certainty to anticipate imminent sales," nor had it "commenced sales of commercial grade series production of its lidar sensors."  ¶4.  This was a meaningful admission, and would even be commented upon later by the CEO of one of Luminar's competitors.  ¶25.

Investor Day was an opportunity to demonstrate that Luminar had made substantial progress toward that goal, particularly considering that after 2021, Luminar acquired Freedom Photonics, and as Eichenholz highlighted in an interview before Luminar Day, its "related photonic integrated circuit technologies[.]"  ¶11.  Given the importance of silicon PICs to scalability in the

---

[10]    *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1250 (M.D. Fla. 2002), which states that "there should be a negative inference regarding scienter" if there is no motive (MTD 22-23), was decided before the Supreme Court's decision in *Tellabs*, which provides that "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."  551 U.S. at 325.  Plaintiff respectfully submits that given the entirety of the scienter allegations in the TAC, the absence of motive "is not fatal" for the reasons explained herein.  *Id.*

19

lidar industry, displaying one that appeared more sophisticated in function and design was a way to telegraph this progress to investors. Additionally, the fraud was ***unlikely*** to be discovered, considering that the image itself was only available on Lidwave's website, described as "[f]inite [c]oherent [r]anging architecture" (not as a "PIC"), and Lidwave is a small, foreign company that Defendants assumed investors would not be familiar with. ¶¶135-42.[11]

That Luminar corrected the slide does not weigh against scienter: Luminar only did so when forced to when the misappropriation became public. *See Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012) ("[E]vidence of concealment is strongly indicative of scienter."). And tellingly, Luminar did not have a similar chip of its own to replace it with.

Even if the Court finds that motive is inadequate, the scienter inquiry is a "holistic" one, *Tellabs*, 551 U.S. at 326, and given all of the foregoing, the TAC pleads sufficient facts to allow the Court to determine that Plaintiff's "inference of scienter [is] at least as strong as any opposing inference," *id.*

## CONCLUSION

Plaintiff respectfully requests Defendants' motion be denied.

Dated:  March 17, 2025                    Respectfully submitted,

                                          By: */s/ James M. Wilson, Jr.*

---

[11]    By contrast, *Police & Fire Retirement System of City of Detroit v. Axogen, Inc.*, 2020 WL 13547449, at *18 (M.D. Fla. Apr. 21, 2020) (MTD 24), concerned a situation in which the defendant company cited to an article without indicating that the research in the article was funded by the defendant company, but the article itself made that disclosure.

James M. Wilson, Jr.

James M. Wilson, Jr. (admitted pro hac vice)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com

Robert W. Killorin (admitted pro hac vice)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE,
Building Four, Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

*Lead Counsel for Lead Plaintiff*

**SCHLESINGER LAW OFFICES, P.A.**
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
Telephone: 954-467-8800
Email:
Jonathan@schlesingerlawoffices.com
JHaberman@schlesingerlawoffices.com

*Liaison Counsel for Lead Plaintiff*

21

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

By: */s/ James M. Wilson, Jr.*
James M. Wilson, Jr.