UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN ALMS,

      Plaintiff,

v.                                Case No: 6:23-cv-982-JSS-LHP

LUMINAR TECHNOLOGIES, INC.,
and MIKE MCAULIFFE,

      Defendants.
_____/

## ORDER

    Defendants move to dismiss Plaintiff's third amended class action complaint

with prejudice.  (Dkts. 81, 87.)  Plaintiff opposes the motion.  (Dkt. 83.)  Upon

consideration, for the reasons outlined below, the motion is denied.

## BACKGROUND[1]

    Defendant Luminar Technologies, Inc. is a publicly traded company that

develops technology used in autonomous vehicles, including light detection and

ranging (LiDAR) sensors.  (Dkt. 78 ¶¶ 1, 7, 47–48, 53, 61.)  LiDAR sensors are

"remote, laser scanning systems . . . used to provide directional images" for

autonomous vehicles.  (*Id.* ¶ 7.)  These sensors can be used to create a high-resolution

3D view of a vehicle's surroundings.  (*Id.*)  A critical engineering challenge in the

highly competitive autonomous vehicle industry is scaling LiDAR technology down

---

[1] The court derives the facts from the third amended complaint (Dkt. 78).  *See Resnick v. AvMed, Inc.*,
693 F.3d 1317, 1321–22 (11th Cir. 2012).

to decrease the cost of manufacturing and to allow the devices to integrate into cars' frames more seamlessly.  (*Id.* ¶¶ 54–60.)  Increasingly advanced photonic integrated circuit (PIC) chips have provided a means to address this challenge.  (*Id.*)  As such, developing cutting edge PIC chips is important to Luminar's business.  Luminar therefore acquired three chip design subsidiaries: Black Forest Engineering, Optogration, and Freedom Photonics.  (*Id.* ¶¶ 62–69.)  These companies were consolidated into a new subsidiary entity, Luminar Semiconductor.  (*Id.*)

On February 28, 2023, Luminar hosted Luminar Investor Day, a conference at which Luminar promised to "unveil its long-term product and technology roadmap for existing and new [original equipment manufacturer] customers."  (*Id.* ¶ 13.)  During a presentation at the conference, Luminar displayed a slide titled Common Platforms Drive Scale with a picture of a competitor's PIC chip (the challenged image):



(*Id.* ¶¶ 13, 19, 92–93.)  Prior to March 17, 2023, this image was available only on competitor Lidwave's website, where it was referred to as "Finite Coherent Ranging architecture."  (*Id.* ¶¶ 34–35, 140–41.)  A google search of "photonic integrated circuit" in 2023 would have been unable to find the challenged image.  (*Id.* ¶ 139.)  As seen below, the slide did not indicate that the challenged image—the graphic at the bottom right—does not belong to Luminar:



(*Id.* ¶ 93.)

Defendant Michael McAuliffe, Chief Executive Officer (CEO) of Luminar Semiconductor, "presented a series of slides" about Luminar. (*Id.* ¶ 91.) One of the first slides in the deck that McAuliffe presented included McAuliffe's name and image:



(*See* Dkt. 78-1 at 250.) Shortly thereafter, McAuliffe presented the slide with the challenged image while discussing the company's "broader ambition to be a photonics player in the wider market" outside the automotive industry. (Dkt. 78 ¶¶ 5, 16, 64.) McAuliffe explained that Luminar Semiconductor would serve as an integral part of Luminar's mission to develop "economically advantageous lidar for passenger and commercial vehicles." (*Id.* ¶ 65.)

With analysts expressing optimism about the company's future, Luminar's stock price rose.  (*Id.* ¶¶ 5, 89.)  On March 3, 2023, Luminar's price peaked at $9.89 for the period between February 28 and March 17, 2023 (the class period).  (*Id.* ¶¶ 6, 90, 155.)  However, on March 17, 2023, Forbes released an article headlined "Lidar Maker Luminar Accused of Using Image of Rival's Chip in Investor Conference."  (*Id.* ¶¶ 26, 97–99.)   In the article, Lidwave identified the challenged image as its own graphic and reported sending both a cease-and-desist letter to Luminar threatening legal action for copyright infringement and a complaint to the Securities and Exchange Commission (SEC) about Luminar's "misuse of [Lidwave's] product image to falsely promote [Luminar's] abilities and securities to investors."  (*Id.* ¶¶ 26, 97–99 143.) Lidwave claimed that "Luminar does not have the ability to produce" the PIC chip pictured in the slide, which demonstrates "integrat[ion of] all optical parts at the chip level."  (*Id.* ¶¶ 29, 77, 143.)  Luminar's stock began to drop that day.  (*Id.* ¶¶ 27, 104).

In response to the article, Luminar replaced the challenged image with the following image of its own PIC chip:



(*Id.* ¶¶ 100–01.)  This replacement image came from a 2019 presentation produced by

Freedom Photonics—one of Luminar's newly acquired companies—which was also the source of the other photos on the Common Platforms Slide. (*Id.* ¶¶ 102, 131–35.) On March 19, 2023, Forbes updated its article to include the replacement image. (*Id.* ¶ 27, 100–02.)

Over the next two trading days, Luminar's stock fell 9.09%, closing at $7.80 on March 20, 2023. (*Id.* ¶ 32, 107, 160.) Four days after that, to respond to the volatility of its share price, Luminar published a blog post, in part addressing Lidwave's public accusations and threats of legal action. (*Id.* ¶ 33.) In it, Luminar explained that, "as part of our Luminar Day, a member of our team included a thumbnail of a generic graphic of a photonic integrated circuit, which was there to give a visual illustration of a generic photonic integrated circuit in our semiconductor section of the presentation." (*Id.* (alteration adopted and quotation omitted).) Referring to Lidwave, Luminar asserted that "a startup company that Luminar has never heard of contacted the media claiming that we were improperly passing off their tech as ours. This is clearly not the case." (*Id.* (alteration adopted).) Despite the post, Luminar's stock price did not rebound. (*See id.* ¶ 5.)

In May 2023, a shareholder filed this class action against Defendants on behalf of purchasers of Luminar's stock during the class period, alleging violations of securities laws based on Defendants' use of Lidwave's PIC chip in the investor presentation. (Dkt. 1.) John Alms is the current class representative. (Dkt. 29 at 9.) Plaintiff filed an amended complaint in October 2023. (Dkt. 37). On Defendants' motion, the court dismissed that complaint without prejudice for failure to state a

claim for securities fraud. (Dkt. 55.) Specifically, the court determined that Plaintiff failed to adequately plead materiality and scienter. (*Id.* at 12–18.) Plaintiff filed a second amended complaint. (Dkt. 59.) On Defendants' motion, (Dkt. 66), the court dismissed the second amended complaint finding that Plaintiff still failed to adequately plead materiality and scienter. (Dkt. 75.) Plaintiff then filed a third amended complaint. (Dkt 78.)

The third amended complaint contains two counts. (*Id.* ¶¶ 175–97.) Count one asserts violations of section 10(b) of the Securities Exchange Act (SEA), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, against both Defendants. (Dkt. 78 ¶¶ 175–87.) Count two alleges violations of section 20(a) of the SEA, 15 U.S.C. § 78t(a), against McAuliffe. (Dkt. 78 ¶¶ 188–97.)

The third amended complaint makes two primary changes from its previous iterations. First, it includes additional factual support from a confidential witness, CW 1, a former Senior Executive Assistant at Luminar from October 2022 to September 2024 who participated in the Luminar Day presentation by providing executive assistance to McAuliffe. (*Id.* ¶¶ 52, 80–83, 131, 135.) Second, it provides information from Michael Lebby, PhD, an expert in electronics and photonics. (*Id.* ¶¶ 3–4, 20–23, 28, 108–28, 134.) Dr. Lebby specifically explains what information is conveyed by the challenged image—an electronic ASIC chip connected via sixteen parallel fiber optic cables to an optics chip, representing a silicon photonics PIC chip, (*id.* ¶ 119)—and the image of Luminar's chip, which has twenty-eight electrical wire bonds and looks like a tunable laser chip fabricated on an InP wafer, (*id.* ¶ 122).

## APPLICABLE STANDARDS

"To survive a motion to dismiss, a claim brought under Rule 10b–5 must satisfy (1) the federal notice pleading requirements[,] (2) the special fraud pleading requirements found in Federal Rule of Civil Procedure 9(b)[,] and (3) the added pleading requirements imposed by the Private Securities Litigation Reform Act of 1995" (PSLRA). *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citation omitted). Federal Rule of Civil Procedure 8(a) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Twombly*, 550 U.S. at 570). Thus, the complaint must contain sufficient factual allegations to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Federal Rule of Civil Procedure 9(b) "requires that the circumstances constituting fraud be stated with particularity." *In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1138 (M.D. Fla. 2005) (alteration adopted and quotation omitted). A plaintiff satisfies Rule 9(b)'s particularity requirement for fraud when the complaint sets forth (1) "precisely what documents or oral representations were made," (2) "the

time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same," (3) "the content of such statements and the manner in which they misled the plaintiff," and (4) "what the defendants obtained as a consequence of the fraud." *Id.* (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). "A sufficient level of factual support for a [Rule 10b–5] claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when[,] where, and how . . . ." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (quotations omitted).

Additionally, the PSLRA, codified at 15 U.S.C. § 78u-4(b), further heightens the pleading burden by requiring that the complaint contain (1) factual specificity as to the alleged material misleading or omitted statements and (2) particular facts raising a "strong inference" that a defendant acted with "the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2). Failure to meet either provision mandates the dismissal of the complaint on the motion of any defendant. *Id.* § 78u-4(b)(3)(A).

## ANALYSIS

Plaintiff alleges that Defendants violated section 10(b) and Rule 10b–5 by "knowingly or recklessly" "making . . . false and misleading statements . . . concerning Luminar's PIC [chip]." (Dkt. 78 ¶¶ 175–87.) Plaintiff also alleges that Defendant McAuliffe violated section 20(a), (*id.* ¶¶ 188–97), which "provides for joint and several liability for 'control persons' once a plaintiff has demonstrated a [section] 10(b) violation." *FindWhat*, 658 F.3d at 1294 n.9. Thus, the success of this latter claim depends upon the success of the former. *Id.* ("[N]o [section]

20(a) claim can lie without first establishing a successful [section] 10(b) claim.").  To

state a claim under section 10(b) and Rule 10b–5, a plaintiff must allege

> (1) a material misrepresentation or omission[,] (2) made with scienter[,] (3) a connection with the purchase or sale of a security[,] (4) reliance on the misstatement or omission[,] (5) economic loss [i.e., damages][,] and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

*Id.* at 1295 (quotation omitted); *see Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37

(2011).

In their motion, Defendants do not contest elements three through six.  Instead,

Defendants argue that Plaintiff fails to adequately allege the first two elements: a

material misrepresentation or omission, (Dkt. 81 at 10–17), and scienter, (*id.* at 18–

25).  Defendants also argue that Plaintiff fails to adequately allege that McAuliffe was

the maker of the challenged image.  (*Id.* at 7–10).  The central issue is whether

Defendants' use of the challenged image—which allegedly appears "much more

sophisticated" than Luminar's technology—satisfies these elements.  (*Id.* at 1–2; Dkt.

83 at 1–5.)

The court begins by considering Defendants' assertion that count one must be

dismissed as to McAuliffe for failure to allege that he was the maker of the challenged

image.  (Dkt. 81 at 7–10.)  The court then addresses Defendants' arguments that the

third amended complaint fails to sufficiently allege materiality, (*id.* at 10–17), and

scienter, (*id.* at 18–25).

## A.  Section 10(b) Claim Against McAuliffe

Defendants argue that the Rule 10b–5 claim must be dismissed as to McAuliffe

because Plaintiff does not allege that McAuliffe was the maker of the challenged image. (*Id.* at 7–10.) Under Rule 10b–5, it is "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit . . . a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. Accordingly, for liability under Rule 10b–5 to attach to McAuliffe, the court must find that he made the misstatement. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011) ("To be liable [under Rule 10b–5,] . . . [the defendant] must have 'made' the material misstatements . . . .").

Defendants contend that McAuliffe is not the alleged maker of the challenged image. (Dkt. 81 at 7–10.) It is true that the court previously recognized that Plaintiff's second amended complaint did "not allege that McAuliffe referenced the graphic depicting Lidwave's PIC chip or otherwise drew attention to it during the presentation." (Dkt. 75 at 21.) The court also stressed that "one 'makes' a statement by stating it, not by implying it." (*Id.* (alteration adopted and quotations omitted).) *See Janus*, 564 U.S. at 142. That said, as Plaintiff persuasively argues, (Dkt. 83 at 12), pictures can qualify as statements. *See Prairie Ventures, LLC v. Liotta*, 2017 WL 11630279, at *4, *8 (N.D. Ga. Aug. 3, 2017) (finding that photographs within marketing materials constitute statements); *see also Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *9 (N.D. Cal. Apr. 28, 2020) (including an image on defendants' website as an example of defendants' statements). That is especially so in this context, where the challenged image appears alongside other images and a series of arrows that

indicate progress towards the last photo in the series, the challenged image.  *See*

*Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257, 264 (2024) (citing

Webster's New International Dictionary 2461 (2d ed. 1942) to define "statement" as

the "[a]ct of stating, reciting, or presenting, orally or on paper")).  Under these facts,

the series of images and arrows constituted an "affirmative assertion[]," and the fact

that the challenged image did not belong to Luminar was "information necessary to

ensure that" the statement on the slide was "clear and complete."  *Id.*  Accordingly,

the omission of the source of the challenged image was a "half-truth[]" that required

"other facts . . . to make [the statement] 'not misleading.'"  *Id.*

    Although McAuliffe may not have explicitly referenced the challenged image

or highlighted it during the presentation, it is possible to make a statement "even

though [one] does not actually say the words aloud."  *In re Impinj, Inc., Sec. Litig.*, 414

F. Supp. 3d 1327, 1335 n.3 (W.D. Wash. 2019).  It is also important to note that

McAuliffe need not have specifically selected the challenged image to have made a

statement that included the challenged image.  After all, "[e]ven when a speechwriter

drafts a speech, . . . it is the speaker who takes credit—or blame—for what is ultimately

said."  *Janus*, 564 U.S. at 143.  In this case, giving a presentation that includes the

challenged image qualifies as a statement where the challenged image was meant as

an assertion about the company's progress.  As a result, the inclusion of the challenged

image on the slide qualifies as a statement.

    The key issue, then, is whether McAuliffe made the statement, which requires

determining whether McAuliffe had ultimate authority over the slide deck.  Under

Rule 10b–5, "the maker of a statement is the person . . . with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. "Without such authority, it is not 'necessary or inevitable' that any falsehood will be contained in the statement," as someone higher up can prevent the statement from being made. *Id.* at 144. In contrast, "[o]ne who prepares or publishes a statement on behalf of another is not its maker," as "[w]ithout control, a person . . . can merely suggest what to say, not 'make' a statement in its own right." *Id.*

The court previously noted that Plaintiff had failed to offer facts in his second amended complaint demonstrating McAuliffe had ultimate authority over the presentation. (Dkt. 75 at 22–23.) Plaintiff has remedied that deficiency in the third amended complaint by including factual support from CW 1. (*See* Dkt. 78 ¶ 52.) Purportedly, according to CW 1, McAuliffe was charged with selling Luminar to investors during his Luminar Day presentation, which included showing pictures of how Luminar's technology had evolved and demonstrating that Luminar's technology was getting "even smaller and more condensed." (*Id.* ¶ 80.) PowerPoint slides were generally reviewed and changed by McAuliffe so that his speech could correspond with the slides he presented. (*Id.* ¶¶ 81, 83, 131.)

This new factual support is sufficient to allege that McAuliffe had ultimate authority over the entire presentation, including the slides. Defendants take issue with the fact that this additional factual substantiation comes from a confidential source. (Dkt. 81 at 8–10.) Yet "[a]lthough a whistleblower who demands confidentiality may be less credible than one who is willing to put his name behind his accusations, [courts]

do not put as much weight on that inference as the defendants suggest." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239 (11th Cir. 2008). Accordingly, the court has "no reason to adopt a per se rule that always requires a securities-fraud complaint to name the confidential source, so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." *Id.* at 1239–40. Although "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case," confidentiality is but "one factor that courts may consider." *Id.* at 1240. Further, confidentiality does "not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Id.* Here, Plaintiff adequately explains the basis for CW 1's knowledge, specifically that CW 1 was a Senior Executive Assistant that provided executive assistance directly to McAuliffe and participated in the Luminar Day presentation preparations. Thus, there is no reason to discount the factual support provided by CW 1 at this stage.

Defendants also insist that CW 1's allegations "are nothing more than speculation and generalities." (Dkt. 81 at 9.) "[C]laims of securities fraud cannot rest on speculation and conclusory allegations." *Garfield*, 466 F.3d at 1265 (quotations omitted). Nonetheless, the requisite detail exists here where CW 1 has alleged who had access to the presentation, the way it was assembled, and the context in which the presentation was prepared, as well as the basis for this knowledge. *See Mizzaro*, 544

F.3d at 1240 ("Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame."); *City of Sunrise Gen. Empls.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *8 (N.D. Ga. May 15, 2018) ("Because the [c]ourt finds that each of the confidential witnesses here is defined by their position and location . . . the [c]ourt is able to determine the basis of each witnesses' knowledge."); *see also Eastwood Enters., LLC v. Farha*, No. 807-CV-1940-T-33EAJ, 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009). Accordingly, the third amended complaint contains the requisite particularity.

Even if McAuliffe's slides were prepared by someone else, the content of what was said and publicly displayed was within the control of McAuliffe, who presented the offending slide. (Dkt. 78 ¶¶ 19, 81, 83, 91, 93, 131.) Not only did McAuliffe allegedly have ultimate authority to edit the slides prepared for him according to CW 1, but also he had the authority to stop speaking or note that the image on the slide he was presenting was not actually a PIC chip belonging to Luminar. (*Id.* ¶¶ 19, 91, 93.) It is also relevant that the slides which McAuliffe presented were explicitly attributed to McAuliffe: his name and picture appeared on the first slide in the set, and his spoken statements corresponded with the text of the slides he presented. (*See* Dkt. 78-1 at 250.) *See Janus*, 564 U.S. at 142–43 ("[A]ttribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."); *see also Sec. & Exch. Comm'n v. Norstra Energy*

*Inc.*, 202 F. Supp. 3d 391, 395–97 (S.D.N.Y. 2016)) (rejecting the defendant's argument that he did not make statements when he "penned but a small portion of the text . . . and was largely making minor content edits"); *Sec. & Exch. Comm'n v. Daifotis*, 874 F. Supp. 2d 870, 877 (N.D. Cal. 2012) ("Attribution is enough to go to the jury."). Thus, facts that indicate whether McAuliffe had a direct role in selecting the challenged image are unnecessary where ultimate authority and attribution are established.

Defendants assert that allegations supporting only an inference that an individual "had the power to suggest what should be communicated to the public . . . [are] not enough." *In re Impinj*, 414 F. Supp. 3d at 1336. However, Plaintiff has "allege[d] non-conclusory facts giving rise to a plausible inference that" McAuliffe "possessed the ultimate authority over the content and dissemination of the statements." *Id.*; *see Janus*, 564 U.S. at 142. Plaintiff claims that McAuliffe was not just a "behind-the-scenes contributor to another's statement." *In re Impinj*, 414 F. Supp. 3d at 1335. Rather, Plaintiff adequately pleads that the statement was McAuliffe's given that McAuliffe contributed to, prepared a speech with, and publicly presented slides attributed to him in which the purportedly misleading image appeared and that McAuliffe made statements corresponding with those slides. (*See* Dkt. 78 ¶ 163.)

Defendants maintain that Plaintiff failed to allege that McAuliffe had ultimate authority over the challenged image. (*See* Dkt. 81 at 22.) *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1272 (11th Cir. 2016) (holding that paying for

promotional articles is not the same as making the statements in those articles and does not support a finding of ultimate authority or control).  Here, however, Plaintiff pleads that although others prepared the slides on McAuliffe's behalf, McAuliffe retained control over the entire public presentation—including the slideshow—and claimed the materials as his own.  (Dkt. 78 ¶ at 80–83, 131; Dkt. 78-1 at 250.)  These allegations suffice to demonstrate that McAuliffe had ultimate authority over the presentation.  *See Janus*, 564 U.S. at 142; *Norstra Energy Inc.*, 202 F. Supp. 3d at 395–97; *Sec. & Exch. Comm'n v. Davison*, No. 8:20-CV-325-MSS-AEP, 2021 WL 3079689, at *3 (M.D. Fla. Mar. 8, 2021).  Defendants also reason that "McAuliffe 'simply being present when a[n alleged] misrepresentation is made'" does not "render [him] responsible for such statement."  (Dkt. 81 at 10.)  *See Jain v. Nexgen Memantine, Inc.*, No. 8:20-CV-2263-VMC-JSS, 2021 WL 1578542, at *6 (M.D. Fla. Apr. 22, 2021) (finding that where two individuals were involved, being present for another's statement does not render one the maker of the statement).  However, since McAuliffe allegedly presented the slides and publicly adopted them as his own, he was not simply present when a misrepresentation was made—in the light most favorable to Plaintiff, McAuliffe himself made the statement.  *See Sec. & Exch. Comm'n v. Pentagon Cap. Mgt. PLC*, 725 F.3d 279, 286–87 (2d Cir. 2013); *Sec. & Exch. Comm'n v. Radius Cap. Corp.*, No. 2:11-CV-116-FTM-29, 2012 WL 695668, at *6 (M.D. Fla. Mar. 1, 2012), *aff'd*, 653 F. App'x 744 (11th Cir. 2016); *Sec. & Exch. Comm'n v. Carter*, 2011 WL 5980966, at *2 (N.D. Ill. Nov. 28, 2011) (finding that a CEO who approved press releases was the maker of the statements contained therein).

Given McAuliffe's purported role in the presentation, Plaintiff has adequately pleaded that McAuliffe was the maker of the statement.  (*See* Dkt. 83 at 11–14.)

## B.  Materiality

A material misleading or omitted statement is "any untrue statement of a material fact" or failure "to state a material fact necessary . . . to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives*, 563 U.S. at 37 (quoting 17 C.F.R. § 240.10b–5(b)).  A misrepresentation or omission is material if it would "be considered significant to the trading decision of a reasonable investor."  *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988); *see id.* at 238 ("It is not enough that a statement is false or incomplete[] if the misrepresented fact is otherwise insignificant.").  A misrepresentation is significant if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Sec. & Exch. Comm'n v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (quotation omitted).

The materiality requirement does not "attribute to investors a child-like simplicity" or "an inability to grasp the probabilistic significance of" certain technological advancements. *Basic Inc.*, 485 U.S. at 234 (quoting *Flamm v. Eberstadt*, 814 F.2d 1169, 1175 (7th Cir. 1987)).  Rather, the materiality requirement "filter[s] out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision."  *Id.* (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–449 (1976)).

"[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor: The inquiry (like the one into materiality) is objective." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186–187 (2015).

The court previously found that Plaintiff's allegations concerning Defendants' use of the challenged image did not satisfy the materiality requirement. (Dkt. 55 at 11 n.5, 12–15.) Specifically, while acknowledging that Luminar's use of the challenged image allegedly misled investors into believing that the graphic depicted Luminar's PIC chip, (*id.* at 12–13), the court concluded that Plaintiff had failed to "explain what 'sophisticat[ion]' or 'function' the graphic conveyed that Luminar's chip lacks (or how it did so)." (*Id.* at 14.) Accordingly, the court concluded that, as pleaded, the misleading graphic did not convey anything about the capabilities of Luminar's product. (*Id.* at 13.)

In the third amended complaint, Plaintiff, for the first time, includes support from Dr. Lebby, an engineer with over forty years of experience in electronics and photonics who has worked extensively with PIC chips. (Dkt. 78 ¶¶ 108–28.) Dr. Lebby explains that the challenged image is an "electronic ASIC chip connected via [sixteen] parallel fiber optic cables to an optics chip," representing "a silicon photonics PIC chip." (*Id.* ¶ 119.) By contrast, the image of Luminar's chip, which replaced the challenged image, "has [twenty-eight] electrical wire bonds and looks like a tunable laser chip fabricated on an InP wafer." (*Id.* ¶ 122.) Simply put, according to Dr. Lebby, the challenged image shows a "high degree of sophistication and integration that could greatly lower the cost of manufacturing and performance." (*Id.* ¶¶ 3, 22,

128.)  In contrast, Dr. Lebby concluded that the image of Luminar's chip does not appear to be silicon photonics at all "but an InP turntable laser chip," which is "not as scalable in cost." (*Id.*)  Because Dr. Lebby's description of Lidwave's and Luminar's chips is based on the same images that investors saw, Dr. Lebby confirms that both images—that of the Lidwave chip and the Luminar chip—can convey information about their sophistication and function without exposing trade secret architecture. (*See* Dkt. 75 at 14.)  Further, based on Plaintiff's complaint, it is well-known in the industry that scaling production depends on the development of PIC chips. (Dkt. 78 ¶¶ 19, 59–60, 93.)  Accordingly, the function and sophistication—and thus the scalability—of Luminar's PIC chips would have been material to a reasonable investor.  If the challenged image was meant to display such scalability, the reasonable investor would likely have recognized that it was material. *See Singer v. Reali*, 883 F.3d 425, 442–43 (4th Cir. 2018); *see also Shash v. Biogen, Inc.*, 84 F.4th 1, 12–13 (1st Cir. 2023).

Although Defendants raise a few problems with Dr. Lebby's allegations, (Dkt. 81 at 12–15, 21), "[a] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 53 (2d Cir. 2023) (quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)); *see also Matrixx Initiatives*, 563 U.S. at 46 ("[T]hese allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement . . . ." (quoting *Twombly*, 550 U.S. at

556)).  Based on Dr. Lebby's claims, it is likely that the challenged image would have "significantly altered the 'total mix' of information made available" by making it seem as though Luminar had made progress towards its goal of creating PIC chips.  *See Basic Inc.*, 485 U.S. at 232.  As such, Plaintiff has shown that reasonable investors likely found the challenged image material.  Therefore, this complaint may not properly be dismissed based on the materiality requirement.

### C. Scienter

Scienter—the PSLRA's requisite mental state—is an "intent to deceive, manipulate, or defraud" or "severe recklessness."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 (11th Cir. 1999).  Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standards of ordinary care[] and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Id.* at 1282 n.18 (quotation omitted).

"Under the PSLRA's heightened pleading instructions," the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quotation omitted).  A "strong inference" is one that is "cogent and compelling . . . in light of other explanations."  *Id.* at 324.  To determine whether a complaint satisfies the "strong inference" standard, courts (1) "accept all factual allegations . . . as true," (2) "consider the complaint in its entirety, as well as other sources courts ordinarily examine" to determine whether all the facts, taken

collectively, "give rise to a strong inference of scienter," and (3) "take into account
plausible opposing inferences." *Id.* at 322–23 (quotation marks omitted).

"The strength of an inference cannot be decided in a vacuum" but is "inherently
comparative." *Id.* at 323. Accordingly, "[t]o determine whether the plaintiff has
alleged facts that give rise to the requisite 'strong inference' of scienter, a court must
consider plausible, nonculpable explanations for the defendant's conduct, as well as
inferences favoring the plaintiff." *Id.* at 323–24. No "smoking-gun" is required, and
the "inference that the defendant acted with scienter need not be irrefutable." *Id.* at
324. In fact, the inference of scienter need not be "even the most plausible of
competing inferences." *Id.* (quotation omitted). Simply put, "[a] complaint will
survive . . . if a reasonable person would deem the inference of scienter cogent and at
least as compelling as any opposing inference one could draw from the facts alleged."
*Id.*

Thus, as the court has explained, Plaintiff must show that Defendants were at
least severely reckless in not knowing about the picture's inclusion. (Dkt. 75 at 20.)
Plaintiff may plead such recklessness by alleging that Defendants had "access to
information contradicting their public statements" to show that Defendants "knew or
should have known that they were misrepresenting material facts." *See In re Sci.
Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1360 (N.D. Ga. 2010), *aff'd sub nom.
Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012); *see also In re Pegasus
Wireless Corp. Sec. Litig.*, 657 F. Supp. 2d 1320, 1327 (S.D. Fla. 2009) ("[F]actors such
as . . . the magnitude of the fraud[] and 'red flags[]' should be examined individually,

- 21 -

with the context as a whole also playing a role in the [c]ourt's consideration." (footnote omitted)).  The court previously found that Plaintiff failed to establish that Defendants were severely reckless.  (Dkt. 75 at 18–25.)  Specifically, since the second amended complaint lacked "allegations as to who [was] responsible" for assembling and editing the presentation, the court found that the innocent explanation—"that a lower-level employee included" the challenged image "on his or her own initiative"—was more compelling.  (*Id.* at 24.)  Considering the third amended complaint, and especially the additional information from CW 1, Plaintiff's factual allegations support an inference of scienter at least as compelling as the innocent explanation.  *See Tellabs*, 551 U.S. at 324.

As discussed above, with added factual support from CW 1, the third amended complaint sufficiently alleges that McAuliffe was the maker of the presentation that included the challenged image.  CW 1's additional support also suggests that McAuliffe possessed knowledge of facts, or at least had access to information, that indicated that McAuliffe knew or should have known that displaying the challenged image would misrepresent material facts.  According to CW 1, McAuliffe was involved in creating the Luminar Day presentation.  (*See* Dkt. 78 ¶¶ 52, 80–83.)[2]  As part of assembling the presentation, CW 1 would contact the contributors, create a

---

[2] Defendants take issue with the fact that CW 1 described how presentations like the one for Luminar Day were typically assembled and who was involved.  (Dkt. 81 at 8–9, 19.)  Even so, that Luminar used the same process for other presentations, and that CW 1 generally describes this process, does not undermine CW 1's account.  *See Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *4 (N.D. Ill. Oct. 30, 2012) (crediting allegations of confidential witnesses who identified a company's "common practice" and finding that they buttressed the plaintiff's falsity allegations).

folder with a document accessible to those working on the presentation, and inform McAuliffe when the presentation was ready for editing. (*Id.*) Thus, McAuliffe purportedly not only had access to the folder and permission to edit the presentation, but he also needed to—and likely did—review it beforehand to prepare for his presentation. (*Id.* ¶¶ 83, 131.) After all, a reasonable person would find it implausible that McAuliffe failed to review and prepare for such a presentation given the importance of the event to the company. (*Id.* ¶¶ 13, 79, 80, 84.) Further, it bears noting that McAuliffe allegedly had access to information indicating that the challenged image was misappropriated from Lidwave. (*Id.* ¶¶ 130, 132–36, 138–41.) Specifically, McAuliffe had access to the 2019 Freedom Photonics document where all the images that belonged to Luminar originated, including the image that ultimately replaced the challenged image. (*Id.* ¶¶ 132–36.) What McAuliffe did not have access to as the CEO of Luminar, however, was the challenged image. (*Id.* ¶¶ 138–41.) In fact, the challenged image was allegedly deliberately sought out, given that the photo was only available on Lidwave's website, according to the third amended complaint. (*Id.*) These allegations support a finding of scienter.

Of course, it is certainly still possible that, as Defendants assert, a lower-level employee included the image of Lidwave's PIC chip on his or her own initiative. (*See* Dkt. 81 at 9, 18, 20, 23.) However, with CW 1's factual support, Plaintiff has satisfied his burden of showing that the inference of scienter is "at least as" compelling as Defendants' innocent explanation. *See Tellabs*, 551 U.S. at 324. That is especially true given that while the addition of the graphic of Lidwave's PIC chip could be

accomplished without the involvement of any senior Luminar officials, the actual presentation of the slide to the public required the involvement of McAuliffe. *Cf. Mizzaro*, 544 F.3d at 1250.

A reasonable person would find it unlikely that McAuliffe—the CEO of Luminar Semiconductor—would not know the difference between a silicon PIC chip belonging to a direct competitor and Luminar's non-PIC, InP chip. (*See* Dkt. 78 ¶¶ 119–27, 148–52; Dkt. 83 at 17.) *See Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1302 (N.D. Ga. 2021) (finding that "core operation" can bolster an inference of scienter); *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018) (same). Additionally, a reasonable person would find it improbable that McAuliffe—who was charged with monitoring and presenting on Luminar's technology—would have thought that displaying a competitor's chip could not present a danger of misleading investors at an event where Luminar advertised that it would "unveil its long-term product." (*See* Dkt. 78 ¶¶ 16–18, 79–80.) *See In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *12 (C.D. Cal. Aug. 4, 2014) (finding an inference of scienter where relevant information fell "squarely within [the] bailiwick" of a company executive); *see also Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014). A reasonable person would also be skeptical of Defendants simply swapping the images while continuing to misidentify Luminar's chip as a photonics PIC chip, despite the SEC's previous concerns about Luminar publicly overstating its technological capabilities and commercial readiness. (Dkt. 78 ¶¶ 4, 25.)

Defendants persuasively argue that generic allegations that they were motivated by a desire to raise capital are unhelpful. (Dkt. 81 at 24–25.) *See also In re CP Ships Ltd., Sec. Litig.*, 506 F. Supp. 2d 1161, 1169 (M.D. Fla. 2007); *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 272 (D. Mass. 2013). It is true that in establishing "a strong inference of scienter," a plaintiff may want to allege "a motive and opportunity to commit fraud." *Bryant*, 187 F.3d at 1283. Ultimately, however, while "motive can be a relevant consideration[,] . . . the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.

At bottom, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. To survive a motion to dismiss, a "plaintiff alleging fraud in a [section] 10(b) action . . . must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Id.* at 328. Further, "facts which individually do not give rise to a strong inference of scienter may be aggregated to rise to the necessary showing." *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004). "Scienter may even be demonstrated by strong circumstantial evidence or allegations." *In re Pegasus*, 657 F. Supp. 2d at 1327; *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1344 (M.D. Fla. 2002) ("Plaintiffs can meet their burden under the PSLRA if they plead facts constituting strong circumstantial evidence . . . ." (quotation omitted)).

Unlike the previous complaints, the third amended complaint raises an inference of scienter at least as compelling as any opposing, non-fraudulent inference. *Phillips*, 374 F.3d at 1018; *see also FindWhat*, 658 F.3d at 1299–1300. Plaintiff's

allegations are, then, sufficient to plead scienter as to McAuliffe to survive dismissal. As to Luminar, "[c]orporations, of course, have no state of mind of their own," so "the scienter of their agents must be imputed to them." *Mizzaro*, 544 F.3d at 1254. As such, Plaintiff's claims as to Luminar also survive dismissal.

## CONCLUSION

Accordingly:

1. Defendants' motion to dismiss (Dkt. 81) is **DENIED**.

2. Defendants shall answer the third amended complaint (Dkt. 78) in compliance with Federal Rule of Civil Procedure 12(a)(4)(A).

   **ORDERED** in Orlando, Florida, on September 10, 2025.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record